T.C. Memo. 1999-400


UNITED STATES TAX COURT


EARL E. CLOUD, JR. AND SHEILA S. CLOUD, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8299-96.                    Filed December 8, 1999.


Earl E. Cloud, Jr., pro se.

Linda K. West, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  Respondent determined the following
deficiencies, additions to tax, and penalties with regard to
petitioners' Federal income taxes:

| Taxable Year | Deficiency | Additions to Tax and Penalties | | |
|---|---|---|---|---|
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6662 |
| 1988 | $11,775 | $2,361 | $662 | -- |
| 1989 | 18,818 | 4,118 | -- | $3,764 |
| 1990 | 19,613 | -- | -- | 3,923 |
| 1991 | 12,827 | -- | -- | 2,565 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After a concession,[1] the issues for decision are: (1) Whether petitioners were engaged in a trade or business involving equipment rental or metal fabrication so as to be entitled to deductions for depreciation and other business expenses; (2) whether petitioners are entitled to claim certain net operating losses for taxable years 1988 and 1989; (3) whether petitioners are liable for the addition to tax under section 6651(a) for taxable years 1988 and 1989; and (4) whether petitioners are liable for the addition to tax under section 6653(a)(1) for taxable year 1988 and the penalty under section 6662 for taxable years 1989, 1990, and 1991.

---

[1] Petitioners failed to present any evidence to dispute respondent's determination that they are liable for self-employment tax. They have not addressed the issue on brief. We treat petitioners' failure to address this issue, in effect, as a concession. See Rule 151(e)(4) and (5); Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 344 (1991); Money v. Commissioner, 89 T.C. 46, 48 (1987).

## FINDINGS OF FACT

The parties have stipulated some of the facts, which are incorporated in our findings by this reference.  Petitioners resided in Huntsville, Alabama, when the petition was filed.  Petitioners filed joint Federal income tax returns for each of the years at issue.

In 1983, petitioner husband (hereinafter petitioner) and his father incorporated Pacer Industries, Inc. (Pacer), an Alabama corporation.  Petitioner was the principal stockholder and managed the business, while also engaging in the practice of law.  Pacer manufactured vending machines in Fyffe, Alabama, employing on average 20-30 persons and servicing as many as 30-40 customers.

In early 1987, Pacer ceased operations in Fyffe when the City of Fyffe locked the doors and put a lien on the building because Pacer was delinquent in paying its rent.  In September 1987, some of Pacer's manufacturing equipment was moved from Fyffe to a building then being leased by Idea Technologies, Inc. (Idea Technologies), in Huntsville, Alabama.  In late 1987, petitioner negotiated with John Ford, who was general manager of one of Pacer's customers, Management Marketing Consultants, to manufacture 600 to 800 vending machines.  Stan Rowe was hired to oversee a crew of several contract-basis workers and an Idea Technologies employee.  After delivery of approximately 400

vending machines, work on this job ceased in February 1988, when Idea Technologies lost its lease on the Huntsville building.

In March 1988, the manufacturing equipment was relocated to a building that had just been leased by Venco, Inc. (Venco), in Brownsboro, Alabama. John Ford located another supplier to fulfill his vending machine order. The equipment was not used in any further manufacturing activity.

Beginning in 1983, National Acceptance Co. of America (NAC) provided Pacer a revolving line of credit, receiving a security interest in Pacer's assets, including its equipment, as well as a personal guaranty from petitioner. Pacer became delinquent on this debt. In 1986, NAC commenced a lawsuit seeking monetary damages from Pacer and petitioners for loan and guaranty obligations and seeking judicial foreclosure of its rights in Pacer's real and personal property. Petitioners made counterclaims against NAC. Other creditors of Pacer and petitioners were made party defendants in the lawsuit. Among these creditors was the Internal Revenue Service.

The lawsuit was dismissed on July 8, 1988, after all parties entered into a settlement agreement. The settlement agreement indicates that Pacer owed approximately $920,000 to the various creditors that were parties to the lawsuit, and that petitioners were personally liable for approximately $840,000. The settlement agreement recites that the assets of Pacer, upon

liquidation, were believed to be worth less than the obligations that Pacer owed NAC. The settlement agreement states:

> Pacer is presently selling its assets to Venco for an agreed upon purchase price of $614,000. Such purchase price is to be paid in monthly installments * * *. Pacer shall retain a Security Interest in its assets as sold to Venco until Venco has made payment in full of such purchase price, plus interest. The purchase of the assets by Venco is subject to the existing liens and security interest in or covering such assets * * *.

Under the settlement agreement, Venco's monthly installment payments for Pacer's assets were required to be paid to the various creditors involved in the lawsuit. The settlement agreement specifies the amounts of the monthly installment payments and the manner in which they are to be divided among the creditors. The settlement agreement also provides that petitioner will not be released from his personal obligations until the various creditors have received payments totaling at least $162,735.[2] Under the settlement agreement, in the event a default occurred in the payment of any payment from Venco, NAC was entitled to file a previously executed consent judgment in favor of NAC and against Pacer and petitioners for the sum of their debts to NAC.

---

[2] This total comprises required installment payments totaling $36,920 to NAC and installment payments totaling $24,494 to the State of Alabama Department of Economic and Community Affairs, as well as satisfaction in full of petitioner's $101,321 Federal tax liability.

On July 1, 1988, Pacer entered into a written agreement (the asset sale agreement) to sell all of its assets to Venco for $598,500, payable in installments corresponding to the amounts specified in the settlement agreement. The asset sale agreement states that Pacer agrees to allow Venco, should Venco deem it economically necessary, to resell the equipment, "with the understanding that in the event of such sale all proceeds derived from said sale shall be tendered to Pacer Industries" for distribution to its creditors holding security interests in the equipment. The asset sale agreement recites that Venco "understands and accepts the fact that * * * [Pacer] contemplates the cessation of all business operations, and the potential of filing for protection under the Bankruptcy Code of the United States of America."

Venco never made any payments for the Pacer equipment. On September 10, 1988, Venco executed a written bill of sale transferring the equipment to petitioner for consideration of $10 and "other good and valuable consideration". The bill of sale states:

> Said sale is subject to all liens of record, security interest, and other encumbrances of record as identified in the Asset Sales Agreement where Venco, Inc. obtained title dated July 1, 1988.

> Cloud's liability to Venco shall be limited for assumption of the debt outstanding on this property to the lesser of, the outstanding payments due as shown on the Asset Sale Agreement or ONE HUNDRED AND SIXTY-FIVE THOUSAND DOLLARS AND 00/100 ($165,000.00) and no more.

Petitioner made payments as necessary to be released from personal liability under the settlement agreement, but the payments fell short of discharging Pacer's total liabilities. In the summer of 1990, NAC seized the manufacturing equipment.

Petitioners made delinquent filing of their Federal income tax returns for taxable years 1988 and 1989 on February 15, 1991. Their Federal income tax returns for taxable years 1990 and 1991 were filed on October 21, 1991, and October 19, 1992, respectively. Petitioners filed Schedules C, Profit or Loss from Business, for businesses described as "equipment rental" for taxable years 1988, 1989, and 1990, and as "metal fabrication" for 1991. On these Schedules C, petitioners reported no income but claimed deductions in the following amounts:

|  | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|
| Depreciation | $25,591 | $51,151 | $51,151 | $31,942 |
| Interest | 15,278 | -- | -- | -- |
| Freight | 1,320 | -- | -- | -- |
| Repairs | 670 | -- | 5,897 | -- |
| Utilities/phone | 2,000 | -- | -- | -- |

Respondent disallowed these claimed deductions on grounds that petitioners had not established that they were engaged in the trade or business of equipment rental or metal fabrication, or that they had any basis in any assets relating to such activities.

OPINION

Section 162 allows a deduction for all the ordinary and necessary expenses paid or incurred while carrying on a trade or business. Section 167(a) allows a depreciation deduction for property used in the trade or business or held for the production of income.

For an activity to constitute a trade or business, it is well settled that "the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). To determine whether petitioners are carrying on a trade or business requires an examination of the facts. See Higgins v. Commissioner, 312 U.S. 212, 217 (1941). Petitioners bear the burden of proof. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioners claim that they were engaged in the trade or business of manufacturing vending machines.[3] It is undisputed, however, that there was no significant manufacturing activity after February 1988, when the manufacturing equipment was relocated from Huntsville to Brownsboro and work on the Ford

---

[3] Although petitioners' Schedules C for taxable years 1988, 1989, and 1990 list the business as "equipment rental", petitioners have not argued at trial or on brief that they were ever engaged in such a trade or business.

order ceased. The manufacturing equipment belonged to Pacer, not petitioners, until July 1988, as evidenced by the July 1988 agreement transferring the equipment from Pacer to Venco. It was not until September 1988 that Venco transferred the equipment to petitioner, as evidenced by the bill of sale dated September 10, 1988, which also expressly reconfirms that title to the equipment was not transferred from Pacer to Venco until July 1, 1988.

Accordingly, we conclude that petitioner's involvement with the manufacturing activity in question--which activity was confined to the first 2 months of the 4 years at issue and involved equipment still owned by Pacer--was in his capacity as shareholder and manager of Pacer, and not in his individual capacity. Generally, a taxpayer may not deduct expenses incurred or paid on behalf of another taxpayer. See Deputy v. du Pont, 308 U.S. 488, 493-494 (1940). Similarly, a shareholder ordinarily may not deduct expenses incurred as an investor in a corporation. See Whipple v. Commissioner, 373 U.S. 193, 199-200, 203 (1963).

At trial, petitioners sought to establish through parol evidence that, notwithstanding the unambiguous documentary evidence to the contrary, petitioner actually acquired the equipment from Venco in 1987. Petitioners argue that Venco actually purchased the metal fabrication equipment from Pacer in 1987 and that in the fall of 1987, petitioner entered into an

oral agreement with Venco to purchase the equipment in question, by accepting an "assignment" of the Venco purchase agreement. Petitioners argue that this oral agreement was memorialized in the bill of sale from Venco to petitioner dated September 10, 1988.

Petitioners' attempted reliance on parol evidence to contradict the terms of unambiguous written contracts is unavailing, as contrary to applicable State law.  See Miner v. Commissioner, T.C. Memo. 1999-358; Colafrancesco v. Crown Pontiac-GMC, Inc., 485 So. 2d 1131, 1133 (Ala. 1986) ("It is fundamental that the parol evidence rule prohibits the contradiction of a written agreement by evidence of a prior oral agreement.") (quoting Shepherd Realty Co., Inc. v. Winn-Dixie Montgomery, Inc., 418 So. 2d 871, 874 (Ala. 1982)).

Moreover, apart from petitioner's own self-serving testimony, the parol evidence adduced does not credibly support petitioners' contentions.  Ed Zielinski testified on behalf of petitioners.  Zielinski's testimony, exhibiting uncertain remembrance of dates, establishes at most that in 1987 he and petitioner may have engaged in discussions and negotiations that culminated in the September 1988 transfer of equipment from Venco to petitioner.  Zielinski testified that "probably around June or something" of 1988, he entered into oral agreements to sell the manufacturing equipment to petitioner.  Accordingly,

his testimony does not establish that there was any actual agreement to transfer the equipment before the summer of 1988, when Pacer transferred the equipment to Venco.[4]

On brief, petitioners argue that even if petitioner did not acquire title to the manufacturing equipment until September 1988, he should be viewed as acquiring beneficial or constructive ownership of the equipment in the fall of 1987. The facts indicate otherwise.  Petitioners' Federal income tax returns state that the manufacturing equipment depreciated on those returns was acquired by petitioners on July 1, 1988.[5]  The record does not show that petitioner assumed any economic obligations with regard to the equipment in the fall of 1987. Nor does the record credibly establish that petitioner's involvement with the equipment before September 1988 was other than in his capacity as shareholder and manager of Pacer, which

---

[4] The testimony of Stan Rowe and the affidavit of John Ford, upon which petitioners also rely, merely indicate that work occurred on the Ford order in late 1987 and early 1988, and do not establish that petitioner owned the manufacturing equipment at those times.

[5] On brief, petitioners suggest that they reported acquiring the equipment on July 1, 1988, because they were using the half-year convention provided under sec. 1.167(a)-11(c)(2)(iii), Income Tax Regs.  Petitioners' explanation, however, is inconsistent with their argument that they acquired the equipment in 1987.

still held title to the equipment and which remained in existence at least until July 1, 1988.[6]

Petitioners argue that even if the manufacturing equipment was idle after petitioner acquired it, he nevertheless should be considered to be in the trade or business of metal fabrication, because he continued, albeit unsuccessfully, to pursue new work orders until the equipment was repossessed by NAC in the summer of 1990. Apart from petitioner's self-serving and uncorroborated testimony, however, there is no evidence of such business activity. Petitioner's testimony does not credibly establish that he was involved in his personal capacity in the metal fabrication business with continuity or regularity, with the primary purpose of producing income or profit. Cf. Commissioner v. Groetzinger, 480 U.S. at 35. To the contrary, petitioner testified that during the years at issue, he was so busy in his family law practice that petitioners were unable even to file timely tax returns.

Having failed to establish that they were engaged in the trade or business of manufacturing vending machines, petitioners have failed to show that the depreciable assets were used in a

---

[6] That Pacer remained in business on July 1, 1988, is indicated by the July 1, 1988, asset sale agreement between Pacer and Venco, which states that Pacer "contemplates the cessation of all business operations, and the potential of filing for protection under the Bankruptcy Code of the United States of America."

trade or business within the meaning of section 167(a)(1). See Steen v. Commissioner, 508 F.2d 268, 270 (5th Cir. 1975), affg. 61 T.C. 298 (1973). Nor have petitioners asserted or established that they otherwise held the manufacturing equipment for the production of income within the meaning of section 167(a)(2). Cf. Yanow v. Commissioner, 44 T.C. 444, 450-451 (1965), affd. 358 F.2d 743 (3d Cir. 1966).

Even if we were to assume arguendo that petitioners were in the trade or business of manufacturing vending machines during the years at issue, they have failed to substantiate their entitlement to the depreciation or other business deductions claimed. To substantiate entitlement to depreciation deductions, petitioners must establish, among other things, the property's depreciable basis. See Delsanter v. Commissioner, 28 T.C. 845, 863 (1957), affd. in part and remanded on another issue 267 F.2d 39 (6th Cir. 1959). Petitioners have failed to do so. On their Federal income tax returns for the years in issue, petitioners reported depreciable basis in the manufacturing equipment that fluctuated erratically from year to year.[7] On brief, petitioners now claim smaller amounts of

---

[7] For taxable year 1988, petitioners reported opening adjusted basis of zero, an increase in basis during the year of $45,000, and their amount at risk as $45,000. For taxable year 1989, petitioners reported opening adjusted basis of $614,000, a decrease in basis of $505,631, and their amount at risk as $108,639. For taxable year 1990--the year in which NAC

(continued...)

depreciation than were claimed on the returns, apparently reducing the claimed depreciable basis by certain items that petitioners now concede were never moved from Fyffe.

Petitioners have introduced no books or records to substantiate or explain their claimed depreciable basis, even though petitioner testified that he kept books and records which he supplied to his accountant.[8]  We draw an adverse inference from petitioners' failure to introduce such evidence that is within their possession.  Cf. Citron v. Commissioner, 97 T.C. 200, 217-218 (1991); Wichita Terminal Elevator Co. v.

---

[7](...continued)
repossessed the equipment--petitioners reported opening basis of $79,448, an increase in basis of $50,000, and their amount at risk as $129,448.  For taxable year 1991--after petitioners no longer possessed the equipment--petitioners reported their adjusted basis in the equipment and their amount at risk as $31,942.

[8] For at least some of the years in issue, petitioners appear to compute their depreciable basis by reference to the provision in the September 1988 bill of sale, which purported to limit petitioner's liability to Venco for assumption of the debt outstanding on the property to no more than $165,000.  This $165,000 liability limit, however, approximates petitioner's personal liability as previously agreed to under the settlement agreement with petitioners' and Pacer's various creditors.  We question whether petitioner assumed any such liabilities pursuant to his purchase of the equipment from Venco and consequently whether such liabilities are appropriately included in petitioner's depreciable basis in the equipment.  Furthermore, we question the bona fides of the various purported transfers of the manufacturing equipment from Pacer to Venco and then to petitioner.  The record does not explain why Venco, having purportedly purchased the equipment from Pacer in July 1988 for $598,500, would then sell the equipment back to petitioner in September 1988 for $10 stated consideration, with the parties agreeing that petitioner's liabilities would not exceed $165,000.

Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Moreover, having conceded that the manufacturing equipment was repossessed in the summer of 1990, petitioners have offered no credible explanation as to why they continued to claim depreciation allowances on it for all of 1990 and 1991.

Similarly, petitioners have failed to substantiate the other business expenses claimed as deductions. Taxpayers are required to substantiate claimed deductions by maintaining and producing the records needed to establish entitlement to their claimed deductions. See sec. 6001. Petitioners failed to do so. They presented no invoices or canceled checks to substantiate their claimed payments for freight, interest, repairs and maintenance, or utilities and telephone.[9] Accordingly, we sustain respondent's determination in this regard.

---

[9] Petitioners introduced copies of a number of canceled checks, many of which appear to represent payments to satisfy petitioner's personal obligations to various creditors as determined under the settlement agreement. Several of the checks are made payable to Venco or Ed Zielinski. Petitioner testified that these checks represent his reimbursements to Zielinski for amounts expended on petitioner's behalf for wages, supplies, and parts. None of the checks, however, have been shown to correlate to the deductions claimed on petitioners' Schedules C, which include no deductions for wages, supplies, or parts.

Net Operating Loss Deductions

On their 1988 and 1989 Federal income tax returns, petitioners claimed net operating loss carryforwards (NOL's) of $25,450 and $8,108, respectively. Respondent disallowed $16,390 of the 1988 NOL and all of the 1989 NOL after determining that petitioners had failed to carry back the losses before carrying them forward, as required by section 172(b)(1)(A) and (2). Respondent recalculated the NOL's, which resulted in most of the NOL's being absorbed in earlier years.

At trial, petitioners presented no evidence regarding this issue. On brief, petitioners state that their "only objection to Respondent's requested adjustment involves the amount of net operating lose [sic] actually used for the years in question." Conceding that some reduction in their claimed NOL's is appropriate, petitioners argue, with little elaboration, that "The exact amount of that reduction would be less than the [sic] claimed by the respondent."

Having failed to present evidence to overcome respondent's determinations to reduce their allowable NOL's, petitioners have failed to carry their burden of proof regarding this issue. See Rule 142(a); Golub v. Commissioner, T.C. Memo. 1999-288. Accordingly, we sustain respondent's determinations.

Addition to Tax for Failure To File Timely Tax Returns

Unless shown to be for reasonable cause and not due to willful neglect, failure to file a return on the due date generally results in an addition to tax in the amount of 5 percent for each month during which such failure continues, but not exceeding 25 percent in the aggregate. See sec. 6651(a)(1).

Petitioners' 1988 Federal income tax return was due April 17, 1989. It was filed February 15, 1991. Petitioners' 1989 Federal income tax return was due April 16, 1990. It was also filed February 15, 1991.

Neither at trial nor on brief have petitioners specifically addressed respondent's determination that they are liable for the section 6651(a) addition to tax. Petitioner testified that petitioners had suffered several misfortunes. He testified that his law partner was murdered and that petitioner wife was frequently ill, necessitating numerous trips to the Mayo Clinic. Petitioners' return preparer testified, however, that the murder occurred in 1980 and that the Mayo Clinic trips were more recent than the years at issue. The scant evidence in the record fails to establish any clear nexus between these misfortunes and petitioners' failure to file timely Federal income tax returns.

Petitioner also testified that he was busier than usual with his law practice, in part because his father, who was also petitioner's law partner, had undergone open-heart surgery.

Being "too busy", however, does not constitute reasonable cause for failure to file timely returns. See <u>Dustin v. Commissioner</u>, 53 T.C. 491, 507 (1969); <u>Olsen v. Commissioner</u>, T.C. Memo. 1993-432. As a practicing attorney, petitioner should have been alert to his legal obligations to file Federal income tax returns. We sustain respondent's determinations on this issue.

<u>Sections 6653(a)(1) and 6662</u>

For returns due after December 31, 1988, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of any underpayment is "due to negligence or disregard of rules or regulations". For returns due after December 31, 1989, section 6662 imposes a penalty equal to 20 percent of the portion of the underpayment that is attributable to negligence or disregard of rules or regulations. Under both sections 6653(a)(3) and 6662(c), negligence includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and disregard includes any careless, reckless, or intentional disregard.

A taxpayer's failure to keep adequate books and records may constitute negligence and also indicates disregard of the rules or regulations requiring a taxpayer to keep records sufficient to establish, among other things, the taxpayer's gross income and deductions. See <u>Crocker v. Commissioner</u>, 92 T.C. 899, 917 (1989).

Petitioners have failed to show that they were not negligent and did not disregard rules and regulations. Petitioners claimed deductions to which they were not entitled. They failed to show that they maintained adequate books and records to provide a rational basis for their claimed deductions and losses. They claimed depreciation allowances for property for periods when the property was held by other entities. They claimed other business deductions for which they have produced no substantiation. Accordingly, we sustain respondent's determination on this issue.

Petitioners argue that the various personal misfortunes and business pressures previously described "limited and restricted * * * [petitioner's] access to information, and records necessary to complete his returns." The sparse evidentiary record regarding these various misfortunes does not establish, however, that any such adverse circumstances would have persisted in 1991 and 1992, when petitioners' returns were finally filed with the assistance of a certified public accountant. Moreover, we are unconvinced that the underpayments as determined herein are attributable to petitioners' lack of information and records rather than to petitioners' lack of good faith in attempting to comply with the provisions of the Internal Revenue Code. Accordingly, we sustain respondent's determinations on these issues.

To reflect the foregoing,

Decision will be entered

for respondent.