**CLEARMEADOW INVESTMENTS, LLC, and Clearmeadow Capital Corp., Tax Matters Partner, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 05–1223 T.**

United States Court of Federal Claims.

June 24, 2009.

---

Thomas C. Pliske and Shine Lin, Stientjes & Pliske, LLC, St. Louis, Missouri, for plaintiffs.

Robert C. Stoddart, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General John A. DiCicco, for defendant.

## OPINION

ALLEGRA, Judge:

"When pondering sexy legal issues," one commentator recently noted, "it is doubtful that tax law crosses the minds of many." [1] Yet, once in a while (alright, a *long* while), a tax dispute bursts into the mainstream. Take, for example, the legal controversy swirling around the so-called "Son of BOSS" transactions—the quoted phrase being short for "sales option bond strategy," the legatee of the "bond and option sales" or "BOSS" strategy. While this case involves a Son of BOSS transaction, perhaps it is best to start by examining the earlier BOSS strategy— "*qualis pater talis filius*," as the Romans used to say.

The BOSS strategy employed a series of transactions seemingly to increase the tax basis of an asset that would eventually be sold, supposedly at a loss. In its simplest form, it worked like this:

Two companies are set up by a promoter— Company A and Company B.

Company A buys a bond with a market value of $50.

Taxpayer X buys the bond from Company A for $1,000,050. However, Taxpayer X pays only $50 in cash, with the remainder of the purchase price taking the form of a promissory note payable by Taxpayer X to Company A for $1 million due in twenty years. Taxpayer X claims that his adjusted tax basis in the bond is $1,000,050.

Taxpayer X then sells the bond to Company B for $50. Because Taxpayer X claims a basis in the bond of $1,000,050 and sells it for only $50, he argues that he has incurred a $1 million loss, which he promptly deducts to offset income that would otherwise be subject to tax.

In the Community Renewal Tax Relief Act of 2000 (the 2000 Renewal Act), Pub.L. No. 106–554, § 309, 114 Stat. 2763A–587 to 638, Congress devitalized this strategy by modifying key provisions in the Internal Revenue Code (the Code) to prevent, in absolute terms, the increase in basis essential to generating the large loss deductions.[2] Even before the passage of the Act, however, tax planners had begun to direct their creative energies elsewhere, focusing, in particular, on the partnership provisions of the Code as a potential new engine for producing large tax losses.

Their efforts eventually led to the christening of the "Son of BOSS" strategy. Under this brainchild, the taxpayer typically would form a partnership and contribute to it an option he had purchased. The partnership would contemporaneously assume a second

1. Hale E. Sheppard, "Only Time Will Tell: The Growing Importance of the Statute of Limitations in an Era of Sophisticated International Tax Structuring," 30 Brook. J. Int'l L. 453, 453 (2005).

2. In Section 309 of the Act, Congress enacted section 358(h)(1) of the Code, which requires the basis of stock received in the sorts of transactions

employed in the BOSS strategy to be reduced by the amount of any liability assumed in the exchange. For this purpose, section 358(h)(3) of the Code defines the term "liability" to include "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of [the Code]." 26 U.S.C. § 358(h)(3).

option that represented a liability of the taxpayer. The taxpayer would then claim that his basis in the partnership was increased by the cost of the purchased option, but not reduced by the partnership's assumption of the obligation. As in the BOSS transactions, this ultimately led the taxpayer to claim a sizable loss deduction when he sold either the partnership interest itself, or some asset whose tax basis was derivable therefrom. Though clothed in the partnership provisions of the Code, the Son of BOSS strategy shared a common aspiration with its forebear—to generate large tax loss deductions with little in the way of capital outlays. And the Internal Revenue Service (the Service) reacted to the "son" much as it had to the "father"—disallowing the claimed loss deductions and assessing a range of penalties.

That, in a nutshell, is what happened in the case *sub judice,* which is a partnership proceeding involving a Son of BOSS transaction, pending before the court on the parties' cross-motions for summary judgment. After carefully considering the parties' briefs and oral argument, the court grants defendant's motion for summary judgment and denies plaintiff's cross-motion for summary judgment. As will be described below, the court finds, as a matter of law, that the Son of BOSS transactions that led to the tax losses at issue did not, under the Code, generate the losses claimed and, at all events, lacked economic substance. It also holds that, aside from any defenses the individual partners may raise in later proceedings, the Service properly asserted the gross valuation overstatement penalty of section 6662 of the Code.

## I. BACKGROUND

First things first. Mark Hutton, a resident of Wichita, Kansas, has been a licensed general contractor since 1992, doing business through Hutton Construction Corporation, an S-corporation.[3] For its 2001 taxable year, the Hutton Construction Corporation issued a K–1 to Mr. Hutton reporting $921,885 of income. Sometime in 2001, an investment advisor approached Mr. Hutton and informed him of an "investment strategy" being offered by the law firm of Cantley & Sedacca, LLP. Mr. Hutton expressed interest in the "strategy," leading him, on October 5, 2001, to contract with Cantley & Sedacca for the provision of legal services in exchange for a flat fee of $150,000. Under that contract, a number of transactions ensued in rapid succession.

On October 9, 2001, Edward Sedacca (the eponymous partner of the aforementioned firm) signed a certificate of formation for Clearmeadow Investments, LLC (Clearmeadow), as a limited liability company. Clearmeadow's initial operating agreement, which was dated October 10, 2001, named Mr. Hutton the company's sole member and represented that he had made a capital contribution thereto of $287,500. On October 12, 2001, Robert Bloink (another attorney with Cantley & Sedacca) signed a certificate of incorporation for Clearmeadow Capital Corporation (Capital), again naming Mr. Hutton as the sole member. (Two days earlier, on October 10, 2001, Mr. Hutton had filed an election to treat Capital as an S-corporation under section 1362 of the Code.) On October 15, 2001, Clearmeadow deposited $287,500 into an account with Deutsche Bank Alex Brown (Deutsche), a brokerage firm. Clearmeadow was formed to invest in certain foreign currency market-linked deposits (MLDs)—instruments similar to certificates of deposit, but with fixed and variable rate interest components. The variable component is paid on the maturity date only if certain contingencies determined by reference to specific financial market measures occur. In this case, those contingencies were based upon variations in the value of certain foreign currencies.

---

3. Subchapter S of the Code (26 U.S.C. §§ 1361–79), establishes, in considerable detail, the circumstances under which certain "small business corporations" can be treated as flow-through entities for federal tax purposes. If the requirements of this subchapter are satisfied, the corporation may elect to have its income and expenses treated as belonging to its shareholders, with the result that the corporation itself is not separately taxed (similar to the treatment afforded partnerships). In the parlance of the Code, corporations qualifying for this treatment are called "S-corporations."

On October 15, 2001, Clearmeadow and an international banking and finance group called Societe Generale (SG) entered into an agreement captioned "Confirmation for Currency Linked Deposit Swap," in which Clearmeadow was denoted the "Depositor" and SG the "Deposit Recipient." The agreement envisioned that on October 16, 2001, Clearmeadow would deposit €27,472,520 ($25 million) with SG. At this point, two transactions were foreseen:

(1) On December 14, 2001, SG would pay Clearmeadow the Deposit Settlement Amount of Q 27,472,520 converted into U.S. dollars at the current spot exchange rate. SG would also pay Clearmeadow a "Fixed Yield," defined as interest on the Deposit Settlement Amount from the date of deposit to that of maturity, calculated at 3.6650 percent per annum.

(2) On December 18, 2001, SG would also pay Clearmeadow a "Premium Yield" if on December 14, 2001, the exchange rate of Japanese yen per U.S. dollar was equal to or greater than ¥124.65. The Premium Yield was to be €4,395,604. As consideration for this option, Clearmeadow was to pay SG a premium of €2,747,252, which SG would retain if the exchange rate of Japanese yen per U.S. dollar was less than ¥124.65 on December 14, 2001.

These transactions were collectively referred to as the "long MLD position."

On the same day, Clearmeadow and SG entered into a second agreement captioned "Confirmation for Currency Linked Deposit Swap." In this agreement, the parties swapped roles—SG was the "Depositor" and Clearmeadow the "Deposit Recipient." This agreement envisioned that SG would deposit €27,472,520 ($25 million) with Clearmeadow. Again the agreement foresaw two transactions, the first of which was the mirror image of the "long MLD position:"

(1) On December 14, 2001, Clearmeadow would pay SG the Deposit Settlement Amount of €27,472,520 converted into U.S. dollars at the current spot exchange rate. Clearmeadow would also pay SG a "Fixed

Yield," defined as interest on the Deposit Settlement Amount from the date of deposit to that of maturity, calculated at 3.6650 percent per annum.

(2) On December 18, 2001, Clearmeadow would also pay SG a "Premium Yield" if on December 14, 2001, the exchange rate of Japanese yen per U.S. dollar was equal to or greater than ¥124.67. The Premium Yield was to be €4,347,352. As consideration for this option, SG was to pay Clearmeadow a premium of €2,717,033, which premium Clearmeadow would retain if the exchange rate of Japanese yen per U.S. dollar was less than ¥124.67 on December 14, 2001.

These transactions were collectively referred to as the "short MLD position." Under this second leg, Clearmeadow stood to profit if the exchange rate of Japanese Yen to U.S. Dollars was between ¥ 124.65 and 124.67 on December 14, 2001. In that instance—and that instance alone—SG would have owed Clearmeadow a Premium Yield of €4,395,604 on the long position, but Clearmeadow would not have owed SG the offsetting Premium Yield of €4,347,352 on the short position.[4]

On October 15, 2001, Mr. Hutton, on behalf of Clearmeadow, authorized Deutsche to "transfer the necessary funds to complete the purchase of the market linked deposits in the notional amount of U.S. $25,000,000 and also to pay the premiums totaling U.S. $2,500,000 associated therewith" from its account to SG. This transfer, however, never occurred. On October 16, 2001, Clearmeadow instead wired $27,500 to SG, to cover the difference between the premium Clearmeadow owed on the long MLD position and received on the short MLD position. (This amount, perhaps not coincidentally, was precisely equal to the amount Deutsche charged to set up the options). Despite the aforementioned transactions, and the apparent need for the Huttons to obtain $27.5 million to finance the MLD transactions, at no point during 2001 did Clearmeadow's account with Deutsche ever exceed $287,500.[5]

---

**4.** Several documents in the record indicate that if this happened, Mr. Hutton would receive a "14,446% profit" on his "net investment of $27,500."

**5.** While Mr. Hutton claims that he believed

On October 19, 2001, Mr. Hutton transferred his entire membership interest in Clearmeadow—including the asset of the long MLD position and the liability represented by the short MLD position—to Capital as a contribution to the latter's capital. That same day, Capital and CF Advisors XXXVII, LLC (CF Advisors), a domestic LLC wholly-owned by a third party, Daniel Brooks (who had ties to both Deutsche and Cantley & Sedacca), executed an amended operating agreement for Clearmeadow. Under that agreement, Capital contributed $287,5000 in exchange for 99,0000 Class A Units and became the Class A Member of Clearmeadow. CF Advisors contributed $2,500 "out of its service fees" for 1,000 Class B Units, and became the Class B Member of Clearmeadow.[6] As will be discussed in greater detail below, by virtue of this arrangement, Clearmeadow became a partnership for Federal income tax purposes. In addition, Capital and CF Advisors agreed to allow Capital to terminate its relationship with CF Advisors any time after December 16, 2001, and, upon that termination, to require CF Advisors to sell its interests in Clearmeadow to Capital.

On December 12, 2001, two days prior to the stated maturity date for the MLDs, SG deposited $30,800 to Clearmeadow's account at Deutsche, representing the difference between the variable interest income from the long position—$2,800,000—and the short position -$2,769,200. On December 14, 2001, the Japanese yen/U.S. dollar exchange rate was ¥127.35, meaning that the premium payments on the short and long legs of the MLD cancelled each other out. On December 14, 2001, Clearmeadow paid $1,000 in U.S. dollars to acquire $1,487.51 in Canadian dollars.

On December 18, 2001, Capital exercised its right to terminate CF Advisors' interest in Clearmeadow, thus ending the partnership and causing the partnership assets to be distributed to Capital. When Clearmeadow was liquidated, Capital claimed a tax basis in the Clearmeadow property equivalent to its basis in the former partnership, which Capital contended was $2,501,000, or the cost of the long MLD position that Capital had contributed to Clearmeadow, unreduced by the short MLD position. On December 24, 2001, Capital sold $597.98 of its Canadian currency (equal to 40.2 percent of its Canadian currency holding) for $323.08 in American currency. On its 2001 tax return, Capital claimed that the Canadian currency had a basis of $1,005,402 (equal to 40.2 percent of the $2,501,000 basis it claimed in all of its Canadian currency). It claimed a loss of $1,004,040, corresponding to the difference between the proceeds on the currency sale (-$323.08), plus $1,039 in income on four small scale trades,[7] less the aforementioned claimed basis ($1,005,402).

On August 29, 2002, Clearmeadow filed a partnership return for the taxable period ended December 2001. The return reported distributions of $284,315 in cash and $2,501,000 in property other than money. The return defined the distributed property as 1,487.51 units of Canadian currency, with a fair market value of $1,000 and a cost basis of $2,501,000. Attached to the return was a K-1 that reported a distribution to Capital of $281,815 in cash and $2,501,000 in property other than money. On August 29, 2002, Capital filed a S-corporation return for the taxable period ended December 2001. That return reported a portfolio loss of $1,004,040,

---

Deutsche was lending him $27.5 million, he cannot recall ever signing a promissory note and no documentation of such a loan has been found.

**6.** According to the restated operating agreement, Capital had solicited CF Advisors as an investment advisor and specialist in foreign currency and foreign currency derivative investments. The parties agrees to pay CF Advisors a fee of $10,000, plus two percent of Clearmeadow's net asset values as of the end of the fiscal year and 20 percent of all income and gains realized during the fiscal year. The $10,000 fee appears to have been paid in two installments—the first was authorized by Clearmeadow on October 10, 2001

(nine days before CF Advisors became a member) and the second on October 18, 2001 (the day before CF Advisors became a member).

**7.** These trades occurred between October 22 and December 6, 2001. In them, Clearmeadow acquired either put or call options involving foreign currency, each time for $2,500, expending a total of $10,000 on the four option purchases. Those transactions produced gross proceeds of $11,039, which when offset by Clearmeadow's $10,000 investment, yielded a gain of $1,039, reported under section 988 of the Code.

which was passed down to its sole shareholder, Mr. Hutton. On his 2001 form 1040, which he filed jointly with his wife on August 28, 2002, Mr. Hutton included the $1,040,040 loss from Capital in his losses from partnership and S corporations. That loss more than offset the $921,885 gain he received that taxable year from Hutton Construction Corporation.

On May 20, 2004, the IRS sent the Huttons a letter advising them of announcement 2004–46, which provided taxpayers with an opportunity to resolve tax liabilities associated with transactions described in Notice 2000–44. That notice, which was entitled "Tax Avoidance Using Artificially High Basis," addressed the tax treatment of "transactions that purport to generate tax losses for taxpayers" and described an arrangement similar to that in which the Huttons participated. *See* IRS Notice 2000–44, 2000–2 C.B. 255.[8] Enclosed with the letter was a Notice of Election to participate in that settlement. On June 21, 2004, the Huttons signed and mailed the notice of election. However, they failed to include with the notice various documentation required by the IRS and persisted in that failure even in the face of an IRS administrative summons, ultimately leading the IRS to inform them that they were no longer eligible for the settlement offer. On August 24, 2005, the IRS instead mailed a notice of Final Partnership Administrative Adjustment (FPAA) to Capital, as the tax

matters partner for Clearmeadow. The FPAA reversed all the items that Clearmeadow reported in 2001 to its partners on forms K–1, finding, *inter alia,* that the purchase and contribution of the MLD positions, the formation of the partnership, and its liquidation had neither business purpose nor economic substance. As a consequence, the FPAA concluded that the transactions should be disregarded and all claimed losses and increases in basis should be denied. The FPAA also proposed various penalties, including that imposed by section 6662 for underpayments attributable to a gross valuation misstatement. Ultimately, the adjustments made by the FPAA resulted in the Huttons owing $175,870 in tax, which amount Mark Hutton deposited with the IRS.

On November 21, 2005, Clearmeadow, through its tax matters partner, filed a petition in this court seeking: (i) a refund of $175,870 in taxes paid pursuant to the FPAA; (ii) a determination of partnership items and the related adjustments set forth in the FPAA; and (iii) a determination that it did not owe the penalties asserted in the FPAA. On January 23, 2007, Mr. Hutton and Clearmeadow filed a class action suit under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68, in the United States District Court for the District of Kansas against, *inter alia,* Deutsche Bank, SG, CF Advisors, and other related entities.[9] Back in this case, the parties filed

---

**8.** Notice 2000–44 stated that both the IRS and Department of the Treasury had "become aware of … arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests," adding that "[t]hese arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests." *Id.* The notice asserted that two variations of the loss-generating transactions—one based upon a loan transaction, the other based upon an option—lacked economic substance. The transaction entered into by plaintiffs fit the description of the option variation, which involved the purchase and writing of options and the transfer of those option positions to a partnership. This variation involved the taxpayer "claim[ing] that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under [I.R.C.] § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call op-

tions." The notice asserted that "[t]he purported losses resulting from the transactions described … do not represent *bona fide* losses reflecting actual economic consequences as required for purposes of [I.R.C.] § 165," which defines the appropriate treatment of losses. *Id.* It further observed that the "purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes" and that such "purported tax benefits … may also be subject to disallowance under other provisions of the Code and regulations." *Id.*

**9.** In his RICO complaint, Mr. Hutton averred:

As described more fully herein, the defendants knowingly acted in concert to market and implement the fraudulent and illegal ML deposit transaction and of the Son of Boss tax shelter transaction. In doing so, the defendants acted

cross-motions for summary judgment.[10] Oral argument on those motions was held on October 29, 2008.

## II. DISCUSSION

■ Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Arko Executive Servs. v. United States*, 78 Fed.Cl. 420, 423 (2007). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

■ When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *see also Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."); *Am. Ins. Co. v. United States*, 62 Fed.Cl. 151, 154 (2004). The court must determine whether the evidence reflects a disagreement sufficient to require fact finding or is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Lockheed Martin Corp. v. United States*, 70 Fed.Cl. 745, 748–49 (2006). All facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348 (citing *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *see also Lockheed Martin*, 70 Fed. Cl. at 749; *L.P. Consulting Group, Inc. v. United States*, 66 Fed.Cl. 238, 240 (2005).

### A.

At the outset, the court is faced with several issues concerning its jurisdiction, the resolution of which necessarily requires it to delve into the partnership audit provisions of the Code.

### 1.

■ "Although they file information returns under section 701 of the Code, partnerships, as such, are not subject to federal income taxes," but "[i]nstead, under section 702 of the Code, ... are conduit entities, such that items of partnership income, deductions, credits, and losses are allocated among the partners for inclusion in their respective returns." *Grapevine Imports Ltd. v. United States*, 71 Fed.Cl. 324, 326 (2006); *see also United States v. Basye*, 410 U.S. 441, 448, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973). In 1982, Congress adopted the current scheme for auditing partnerships in the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324, 648–71 (TEFRA). TEFRA "created a single unified procedure

with full knowledge and awareness that the transaction was designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance from an investment standpoint when in fact they lacked those features (which was necessary for successful tax strategy).

**10.** In their responses to defendant's proposed findings of fact, plaintiffs repeatedly object to defendant's use of deposition testimony to support its proposed findings, claiming that the use, in particular, of the deposition of Daniel Brooks (who owned CF Advisors) violates RCFC 32. The latter rule, however, does not preclude the use of a deposition in conjunction with a motion for summary judgment. Indeed, the use of depositions to supplement an affidavit is explicitly authorized by RCFC 56. *See* RCFC 56(e)(1) ("The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits."); *see also Abdallah v. Caribbean Security Agency*, 557 F.2d 61, 63 (3d Cir.1977) (construing the comparable Federal rule); 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2722 (2009) ("In addition to the pleadings, Rule 56(c) expressly provides that the court may make use of depositions on a summary-judgment motion.").

for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level." *In re Crowell,* 305 F.3d 474, 478 (6th Cir.2002) (citing H.R. Conf. Rep. No. 97–760, at 599–600 (1982), U.S.Code Cong. & Admin.News 1982, p. 781). Effectuating this design, section 6221 of the Code generally provides that "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level." 26 U.S.C. § 6221. In the case of an audit, the Service's final determinations take the form of a final partnership administrative adjustment or FPAA, which is generally issued to the tax matters partner the partner with prime responsibility for representing the partnership in any audit or resulting tax litigation. *See* 26 U.S.C. §§ 6223–25; *see also id.* at §§ 6211(c), 6230(a)(1).

Judicial review of the FPAA findings is provided by section 6226 of the Code. Subsection (a) of that section provides that "[w]ithin 90 days after the day on which a notice of a final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a petition for a readjustment of the partnership items for such taxable year with— ... (3) the Court of Federal Claims." 26 U.S.C. § 6226(a). On or before the date such a readjustment proceeding is filed, the partner filing the petition must deposit with the Treasury Department the amount by which its tax liability would be increased if the FPAA is sustained. 26 U.S.C. § 6226(e). Section 6226(f) of the Code describes this court's jurisdiction in such TEFRA cases thusly—

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or

additional amount which relates to an adjustment to a partnership item.

26 U.S.C. § 6226(f); *see also id.* at §§ 6211(c), 6230(a)(1). While TEFRA defines a "partnership item" in various ways, the concept generally encompasses items "required to be taken into account for the partnership's taxable year" and those "more appropriately determined at the partnership level than at the partner level." *Id.* at § 6231(a)(3); *see Keener v. United States,* 551 F.3d 1358, 1362 (Fed.Cir.2009). The relevant Treasury Regulation further defines a "partnership item" to include "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Treas. Reg. § 301.6231(a)(3)–1(b).

■ Under these provisions, this court is authorized to determine all the partnership items that enter into the calculation of Clearmeadow's basis in its assets-a concept referred to as the "inside basis" of the partnership. *See* Treas. Reg. § 301.6231(a)(3)–1(a)(1)(v); Treas. Reg. § 301.6231(a)(3)–1(c)(2)(i). The court thus may determine, *inter alia,* the tax impact, at the partnership level, of Clearmeadow's apparent assumption of the liability contributed by Mr. Hutton's S-corporation (the MLD short position) and whether any of the partnership-level transactions lacked economic substance. The impact of those determinations will be felt by the individual partners after this proceeding is concluded, particularly in determining the Huttons' basis in their partnership interest (the "outside basis" in the partnership). *See* 26 U.S.C. § 6230(a); Treas. Reg. § 301.6231(a)(6)–1(a)(2); *Domulewicz v. Comm'r of Internal Revenue,* 129 T.C. 11, 18, 2007 WL 2262884 (2007); *see also Kornman & Assocs., Inc. v. United States,* 527 F.3d 443, 456 n. 12 (5th Cir.2008) (describing the related concepts of "inside" and "outside" bases). In addition, under sections 6221 and 6226(f), this court is authorized to determine any potential partnership-level defenses to the assertion of the gross valuation misstatement penalty under section 6662(f) of the Code.[11] It must decide, for example, whether

---

11. As part of the Taxpayer Relief Act of 1997, Pub.L. No. 105–34, § 1238(a), 111 Stat. 1026,

a gross valuation misstatement occurred here and, if so, whether a tax underpayment was "attributable to" that misstatement. *See Alpha I, L.P. ex rel. Sands v. United States,* 84 Fed.Cl. 622, 626–27 (2008); *Jade Trading, L.L.C. v. United States,* 80 Fed.Cl. 11, 54–55 (2007).[12]

**2.**

■ The parties disagree, however, as to whether this court has jurisdiction to consider whether the "reasonable cause" exception to the "gross valuation misstatement" penalty contained in section 6664(c) of the Code applies here. Section 6664(c)(1) states that "[n]o penalty shall be imposed under section 6662 ... with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." 26 U.S.C. § 6664(c)(1). Defendant asserts that this exception may be invoked only by individual partners and then only in actions brought by those individual partners on their own behalf. Plaintiffs, however, claim that jurisdiction to consider the "reasonable cause" exception springs from the portion of section 6226(f) which allows this court to consider "the applicability of any penalty ... which relates to an adjustment of a partnership item." And they note—correctly, as it turns out—that several cases have so held, including *Stobie Creek Investments, LLC v. United States,* 82 Fed. Cl. 636, 703 (2008), and the Fifth Circuit's recent decision in *Klamath Strategic Investment Fund ex rel. St. Croix Ventures v. United States,* 568 F.3d 537, 548 (5th Cir. 2009). Yet these cases—and plaintiffs' arguments predicated thereupon—appear to proceed from several false premises.

The first of these is that this jurisdictional point is not addressed by the relevant Treasury Regulations—a contention recently reiterated by the Fifth Circuit in *Klamath,* when it stated that the regulation "does not indicate that reasonable cause and good faith may never be considered at the partnership level." 568 F.3d at 548. This statement, however, is perplexing, to say the least, for both the final regulations applicable here, and even the temporary regulations considered by the Fifth Circuit, not only state that partner-level defenses "may not be asserted in [a] partnership-level proceeding," but also specifically cite the "reasonable cause" defense in section 6444(c)(1) as an example of such a precluded partner-level defense. *See* Treas. Reg. § 301.6221–1(d); *see also* Temp. Treas. Reg. § 301.6221–1T(c)–(d). With all due respect, it is difficult to imagine how the regulations could be any clearer in this regard. And while one is left to wonder whether some cases have worked a *sub silentio* invalidation of the regulation, the fact is that plaintiffs here have provided no basis for invalidating this quite explicit regulation. In short, then, the decisions in plaintiffs' favor run directly contrary to a valid regulation that this court has neither the inclination nor any grounds to ignore.

■ The second *non sequitur* underpinning the cases cited by plaintiffs is that jurisdiction to consider the reasonable cause defense in a partnership-level proceeding somehow directly derives from section 6664(c)(1), a claim perhaps most visible in *Stobie,* 82 Fed.Cl. at 716–17. But, even if one overlooks the fact that section 6664(c)(1) is not a jurisdictional grant—a sockdolager in its own right—it remains that the plain language of that provision confers the "reasonable cause" defense not on the partnership, but on the individual partners. The exception, that is, applies only where the "taxpayer" acted in good faith. 26 U.S.C. § 6664(c)(1). The use of the term "taxpayer" is significant, for it is only a partner, and

---

Congress amended sections 6221 and 6226(f) to provide that the applicability of penalties that relate to adjustments to partnership items is determined at the partnership level. Before the amendment, the applicability of all penalties was determined at the partner level because penalties are affected items. *See Petaluma FX Partners, LLC v. Comm'r of Internal Revenue,* 2008 WL 4682543, at * 11 (U.S.Tax Ct. Oct.23, 2008).

**12.** As will be discussed in greater detail below, a gross valuation misstatement is one in which "the value of any property claimed on any tax return is four hundred percent or more of the amount determined to be the correct amount." *Maguire Partners–Master Investments, LLC v. United States,* 2009 WL 279100 at * 20 (C.D.Cal. Feb.4, 2009).

not the partnership, that qualifies as a "taxpayer" within the meaning of the Code (at least for purposes of the income tax). *See* 26 U.S.C. § 7701(14) (a "taxpayer" is "any person subject to any internal revenue tax"); *see also Guaranty Trust Co. of New York v. Comm'r of Internal Revenue,* 303 U.S. 493, 496, 58 S.Ct. 673, 82 L.Ed. 975 (1938); *Hayden v. Comm'r of Internal Revenue,* 204 F.3d 772, 775 (7th Cir.2000). Any ambiguity in this regard is dispelled by the Treasury Regulations underlying section 6664, which, in a paragraph dedicated to "pass-through items," repeatedly distinguish between a taxpayer and its partnership. They indicate, for example, that in deciding whether the "reasonable cause" defense applies, one must focus not only on "the actions of the pass-through entity," but also on the "the taxpayer's own actions"—a distinction that would be nonsensical if the "pass-through entity" and the "taxpayer" were one in the same. Treas. Reg. § 1.6664–4(e). The regulations go on to state that "the most important factor" in determining "reasonable cause" is "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability," *id.* at § 1.6664–4(b)(1), again distinguishing the taxpayer from its partnership. Accordingly, both the statutory language and the underlying regulations indicate that the defense in section 6664 is possessed only by the individual partners, to be pursued by them in future partner-filed refund actions. *See Jade Trading,* 80 Fed.Cl. at 59; *see also Fears v. Comm'r of Internal Revenue,* 129 T.C. 8, 10, 2007 WL 2213872 (2007); *7050 Ltd. v. Comm'r of Internal Revenue,* 95 T.C.M.(CCH) 1413, 1416 (2008).

■ Finally, despite intimations to the contrary, *see Stobie,* 82 Fed.Cl. at 703, jurisdiction over partner-level defenses certainly cannot depend upon whether the tax matters partner chooses "to offer[ ] the defense" or whether it is convenient or efficient for it to do so. Whatever the merits of such considerations, they carry no weight in resolving questions of jurisdiction, particularly where sovereign immunity is implicated.[13] As the Supreme Court long ago noted, "[c]onsent alone gives jurisdiction to adjudge against a sovereign." *United States v. U.S. Fidelity & Guar. Co.,* 309 U.S. 506, 514, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *see also Gonzalez v. Dep't of Transp.,* 551 F.3d 1372, 1379 (Fed.Cir. 2009). Consent to resolve the "reasonable cause" defense must derive from an appropriate legislative grant of jurisdiction—and, strive and search though plaintiffs may, the simple fact is no such grant exists.[14]

Accordingly, with all due respect, the court is compelled to conclude that the decisions cited by plaintiffs are in error. Contrary to plaintiffs' claim, the court must demur to the assertion that it has jurisdiction to resolve issues involving a "reasonable cause" defense to the gross value misstatement penalty asserted in the FPAA here. Instead it holds, as many other cases have concluded, that the penalty inquiry here is necessarily limited to defenses that can be raised properly only at the partnership level.[15] With its efforts now

---

13. *See Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 577, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004) (rejecting "an approach to jurisdiction that focuses on efficiency and judicial economy"); *Keene Corp. v. United States,* 508 U.S. 200, 217–18, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (noting that the " 'proper theater' for such arguments ... 'is the halls of Congress, for that branch of the government has limited the jurisdiction of the Court of Claims' ") (quoting *Smoot's Case,* 15 Wall. 36, 45, 21 L.Ed. 107, 8 Ct.Cl. 96 (1873)); *see also Arthur Andersen LLP v. Carlisle,* — U.S. —, 129 S.Ct. 1896, 1900–01, 173 L.Ed.2d 832 (2009); *Harbuck v. United States,* 378 F.3d 1324, 1330 (Fed.Cir.2004); *LeBlanc v. United States,* 50 F.3d 1025, 1029 n. 3 (Fed.Cir.1995).

14. Plaintiffs also claim that evidence that Congress intended the "reasonable cause" defense to be considered at the partnership level may be

found in the aforementioned 1997 amendments to sections 6221 and 6226(f), which provided that the applicability of penalties that relate to adjustment to partnership items may be determined at the partnership level. But, Congress did not intend these amendments to decree broadly that every issue governing the imposition of a penalty on a partner be determined at the partnership level. To the contrary, the House Report accompanying this legislation makes clear that the penalty issues to be resolved at the partnership level essentially involve the partnership as a whole and that partners were expected to raise "partner-level defenses" in individual proceedings, such as a refund suit. H. Rep. No. 105–148, at 594 (1997).

15. *See Jade Trading,* 80 Fed.Cl. at 59 ("Partner-level defenses to any penalty that relates to the adjustment of a partnership item in a partner-

properly channeled, the court turns to the issues before it.[16]

## B.

▇ While the primary focus here is on Clearmeadow and the so-called "inside basis" of the partnership, it is important not to forget that the losses asserted by the Huttons based upon their S-corporation's "outside basis" in the partnership are deductible, if at all, under section 165 of the Code. That section provides, in pertinent part:

> **SEC. 165. LOSSES.**
>
> (a) General Rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
>
> (b) Amount of Deduction.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

Under sections 1011 and 1012 of the Code, a taxpayer's basis in an item is generally its cost. *See United States v. Chicago, B. & Q.R. Co.*, 412 U.S. 401, 406 n. 7, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973). Plaintiffs claim that Mr. Hutton's basis in his interest in Clearmeadow was increased by the cost of the long MLD position, but not reduced to account for the partnership's assumption of the short MLD position.

▇ Part and parcel of this argument is the claim that the partnership's assumption of the obligation did not constitute the assumption of a "liability" for purposes of section 752. The pertinent portions of the latter section, which defines a partner's adjusted basis in a partnership, state:

## SEC. 752. TREATMENT OF CERTAIN LIABILITIES.

> (a) Increase in partner's liabilities.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.
>
> (b) Decrease in partner's liabilities.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

So "when a partnership assumes a liability from a partner or a partner contributes property to a partnership subject to a liability, the partner will be treated as receiving a deemed distribution of money from the partnership to the extent of the difference between the amount of the liability and the partner's share of such liability after the partnership's assumption of the liability." Blake D. Rubin, Andrea Macintosh Whiteway, "Final Partnership Liability Regulations Target 'Son of Boss' Abuse But Sweep More Broadly," 857 PLI/Tax 839, 843 (2009). Completing this statutory scheme, section 733(1) of the Code requires that the partnership's basis in the partnership interest be reduced (but not below zero) by "the amount of any money distributed to such partner." 26 U.S.C. § 733(1). In other words, the assumption by the partnership of an individual partner's liabilities is considered a distribu-

---

ship-level proceeding cannot be litigated in this proceeding."); *New Millennium Trading, LLC v. Comm'r of Internal Revenue*, 2008 WL 5330940 at * 8 (U.S.Tax Ct. Dec.22, 2008) ("Because the statutory scheme provides that a partner may raise his partner-level defenses only in a later refund action, the regulation is entitled to deference by this Court."); *Tigers Eye Trading, LLC v. Comm'r of Internal Revenue*, 2009 WL 1475159, at * 13 (U.S.Tax Ct. May 27, 2009) (same); *AWG Leasing Trust v. United States*, 592 F.Supp.2d 953, 995–96 (N.D.Oh.2008) ("The Treasury Regulation thus establishes that the reasonable cause defense is an example of a partner-level defense against accuracy-related penalties that should be asserted in a later partner-level refund suit, not in the TEFRA proceeding itself.").

16. In their petition, plaintiffs asserted that the FPAA was untimely under section 6229(a) of the Code. They, however, abandoned this issue in their briefs. At all events, it appears that the FPAA here was timely, having been filed less than three years after the date the relevant partnership return here was filed. *See* 26 U.S.C. § 6229(a)(1); *see also Grapevine Imports*, 71 Fed. Cl. at 328 (discussing how this statute of limitations works).

tion of money to that partner which, in turn, reduces the partner's outside basis in the partnership interest. *See Kornman,* 527 F.3d at 456–57. Accordingly, if Clearmeadow's assumption of the short MLD position is viewed as assuming a liability of one of its partners, the partnership's inside basis must be reduced by the amount of that liability. That would have the effect of eliminating all, or virtually all, of the losses claimed by the partners. *Id.* at 458.

### 1.

The Code does not define the term "liability" for purposes of section 752. Nevertheless, in enacting, in 2000, the provisions that effectively ended the BOSS transactions, Congress took steps to address this issue administratively. It enacted section 309(c)(1) of the 2000 Renewal Act, which directed the Secretary to prescribe rules to provide "appropriate adjustments under subchapter K of chapter 1 of [the Code] to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) . . . in transactions involving partnerships." § 309(c)(1), 114 Stat. 2763A–638. Section 358(h)(3)—part of the provisions that addressed the BOSS transactions—defines the term "liability" to include "any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of" the Code. 26 U.S.C. § 358(h)(3). Under section 309(d)(2) of the 2000 Renewal Act, the regulations are to apply to assumptions of liability that occur after October 18, 1999, or such later date as may be prescribed. § 309(d)(2), 114 Stat. 2763A–638; *see also Stobie,* 82 Fed. Cl. at 669.

▮ On May 26, 2005, the IRS promulgated regulations under this provision. *See* T.D. 9207, 70 Fed.Reg. 30334 (May 26, 2005). Treas. Reg. § 1.752–6 applies retroactively to transactions occurring after October 18, 1999, and before June 24, 2003.[17] With exceptions not herein relevant, subsection (a) of this regulation provides, in general that:

If, in a transaction described in section 721(a), a partnership assumes a liability (defined in section 358(h)(3)) of a partner (other than a liability to which section 752(a) and (b) apply) then, after application of section 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of this section, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under §§ 1.752–1 through 1.752–5.

At the same time it promulgated this regulation, the IRS modified Treas. Reg. § 1.752–1(a)(4)(i) to include the following definition of liability:

An obligation is a liability for purposes of section 752 and the regulations thereunder (§ 1.752–1 liability), only if, when, and to the extent that incurring the obligation—

(A) Creates or increases the basis of any of the obligor's assets (including cash);

(B) Gives rise to an immediate deduction to the obligor; or

(C) Gives rise to an expense that is not deductible in computing the obligor's taxable income and is not properly chargeable to capital.

*See also* Rev. Rul. 88–77, 1988–2 C.B. 128 (laying the theoretical predicate for this definition). By combining this broad definition of liability with the requirement that a taxpayer's outside basis in a partnership must be reduced to reflect the partnership's assumption of that liability, the regulations prevent losses from being generated through the transfer to partnerships of various obligations. *See Cemco Investors, LLC v. United States,* 515 F.3d 749, 751 (7th Cir.2008) (Treas. Reg. § 1.752–6 "scupper[s] the entire class of offsetting-option tax shelters . . . by subtracting, from the partnership's basis in an asset, the value of any corresponding liability"); *Maguire Partners–Master Invest-*

---

**17.** Another set of regulations applies to transactions occurring on or after June 24, 2003. *See* Treas. Reg. § 1.752–7. While plaintiffs intimate that defendant seeks to apply these regulations to their transaction, there is no evidence of this—rather, defendant focuses solely on Treas. Reg. § 1.752–6.

*ments,* 2009 WL 279100 at \*19 ("If Treasury Regulation § 1.752–6 is applied retroactively in this case, the short options at issue would constitute liabilities for purposes of I.R.C. § 752, and, thus, would require a reduction in the partnership basis claimed by Plaintiffs.").

### 2.

On brief, defendant argues that, consistent with its terms, this regulation applies retroactively to the transaction in question, resulting in Capital's basis in Clearmeadow being reduced by the amount of the short MLD position. Faced with similar arguments, other taxpayers have challenged the validity of the regulation itself, particularly in terms of its retroactivity.[18] But, plaintiffs have chosen not to do so. Nonetheless, they mount a vigorous challenge to the application of the regulation to their transactions on several grounds.

■ First, they assert that the regulation is wholly inapplicable because Clearmeadow never assumed any liability from Capital—essentially arguing that the receipt by Clearmeadow of Capital's liability was a contribution to capital under section 351 of the Code and thus did not represent an assumption of that liability by the partnership for purposes of Treas. Reg. § 1.752–6. This argument, however, assumes that when Clearmeadow admitted CF Advisors as an additional member, what was formed was not a partnership, but rather a "multi-member disregarded entity" (as plaintiffs call it). Plaintiffs, however, cite no authority recognizing the existence of the latter entity and, for good reason, as it is the reddest of red herrings—a total fiction, that is. Treas. Reg. § 301.7701–3(a) indicates that a "business entity" that is not a corporation "with a single owner can elect to be classified as an association or to be disregarded as an entity separate from its owner." The latter was the case here when Clearmeadow was owned

by Mr. Hutton. When CF Advisors was admitted to the entity, Clearmeadow could have elected to be taxed as a corporation under Treas. Reg. § 301.7701–3(a), but it did not do so. In that instance, it automatically became a partnership-the regulations state that, "unless the entity elects otherwise," a domestic business entity is "[a] partnership if it has two or more members." Treas. Reg. § 301.7701–3(b); *see McNamee v. Dep't. of the Treasury,* 488 F.3d 100, 108 (2d Cir.2007); *Medical Practice Solutions, LLC v. Comm'r of Internal Revenue,* 2009 WL 855945 at \* 4 (U.S.Tax Ct. March 31, 2009). Accordingly, the assumption by Clearmeadow of Capital's short MLD position was neither a contribution to a capital, nor a transaction with some sort of fictive "multi-member disregarded entity," but rather the assumption by the partnership of the MLD position, thereby satisfying a key requirement for bringing the transaction within the coverage of Treas. Reg. § 1.752–6. *See McNamee,* 488 F.3d at 111 ("[t]here is no Code provision or regulation that allows a partnership to be disregarded as an entity").[19]

Next, plaintiffs argue that Treas. Reg. § 1.752–6 does not apply to them because the transaction in question falls within an exception to the regulation provided by section 358(h)(2)(A) of the Code (which was enacted by Congress as part of the 2000 Renewal Act). This claim requires a bit of explanation. Section 358(h)(1) of the Code provides basis tracing rules for certain reorganizations, generally providing that where property is transferred to a corporation in exchange for stock and the corporation assumes certain obligations of the transferor, the basis in the stock received is reduced by the amount of liability assumed. *See* Martin D. Ginsburg & Jack S. Levin, Mergers, Acquisitions and Buyouts ¶ 901.2.2 (2009). Section 358(h)(2) of the Code provides exceptions to this rule, stating:

---

**18.** *Compare Sala v. United States,* 552 F.Supp.2d 1167, 1198–99 (D.Colo.2008); *see also Klamath Strategic Investment Fund v. United States,* 568 F.3d 537, 546 (5th Cir.2009); *Kornman,* 527 F.3d at 462; *cf. Cemco Investors,* 515 F.3d at 751–52 (concluding that the regulation was validly retroactive).

**19.** Any notion, moreover, that the liability somehow remained with Capital is belied by the fact that the liability was later paid not by Capital, but by Clearmeadow. Moreover, it was Clearmeadow and not Capital which reported the payment as a deductible expenditure on its tax return.

(2) **Exceptions.**—Except as provided by the Secretary, paragraph (1) shall not apply to any liability if—

(A) the trade or business with which the liability is associated is transferred to the person assuming the liability as part of the exchange, or

(B) substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange.

Treas. Reg. § 1.752–6(b) explicitly precludes taxpayers who participated in transactions described in Notice 2000–44 from relying on the exception contained in section 358(h)(2)(B), stating:

(b) Exceptions—

(1) **In general.** Except as provided in paragraph (b)(2) of this section, the exceptions contained in section 358(h)(2)(A) and (B) apply to this section.

(2) **Transactions described in Notice 2000–44.** The exception contained in section 358(h)(2)(B) does not apply to an assumption of liability (defined in section 358(h)(3)) by a partnership as part of a transaction described in, or a transaction that is substantially similar to the transactions described in, Notice 2000–44 (2000–2 C.B. 255)....

But, as plaintiffs correctly observe, the regulation does not bar them from relying on section 358(h)(2)(A). *See Sala*, 552 F.Supp.2d at 1197 (making this same observation). In their view, Capital transferred "the trade or business with which the liability [was] associated" to Clearmeadow, "the person assuming the liability as part of the exchange." As such, they view the transaction as qualifying for the safe harbor of section 358(h)(2)(A), with the effect of precluding defendant from treating the assumption of the MLD short position by Clearmeadow as a transfer of a liability.

Neither section 358 itself, the regulations thereunder, nor Treas. Reg. § 1.752–6 defines what is a "trade or business" for purposes of the exception in section 358(h)(2)(A). *See Moller v. United States*, 721 F.2d 810, 813 (Fed.Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). Plaintiffs rely heavily upon the definition of that phrase contained in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23, 107 S.Ct. 980, 94 L.Ed.2d 25 (1987). In that case, the Court decided whether a gambler was in a "trade or business" for purposes of section 162(a) of the Code. It indicated "that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be income or profit." *Groetzinger*, 480 U.S. at 35, 107 S.Ct. 980. "[S]poradic activity," the Court emphasized, "does not qualify." *Id.; see also LDL Research & Dev. II, Ltd. v. Comm'r of Internal Revenue*, 124 F.3d 1338, 1346 n. 6 (10th Cir.1997). While the Court "confined" its construction of the phrase "trade or business" to section 162 of the Code, *Groetzinger*, 480 U.S. at 27 n. 8, 107 S.Ct. 980, other courts have found its definition equally applicable in interpreting many other Code requirements dependent upon the existence of a "trade or business." [20] And this court sees

---

20. The *Groetzinger* test has been employed in interpreting the phrase "trade or business" with respect to the following Code sections—section 165 (loss): *Culberson v. Comm'r of Internal Revenue*, 2009 WL 56916, at ⁺ 5 (U.S.Tax Ct. Jan.8, 2009); 167 (depreciation): *Cloud v. Comm'r of Internal Revenue*, 78 T.C.M. (CCH) 924, 926–27 (1999); *Ciaravella v. Comm'r of Internal Revenue*, 75 T.C.M. (CCH) 1635, 1642 (1998); section 174 (research and development expenditures): *Harris v. Comm'r of Internal Revenue*, 16 F.3d 75, 81–82 (5th Cir.1994); section 183 (activities not engaged in for profit): *Johnson v. United States*, 32 Fed.Cl. 709, 714–15 (1995); section 195 (start-up expenditures): *Sealy Power, Ltd. v. Comm'r of Internal Revenue*, 46 F.3d 382, 400 n. 94 (5th Cir.1995); *Woody v. Comm'r of Internal Revenue*, 97 T.C.M. (CCH) 1484, 1486–87 (2009); section 469 (passive activity loss limitation): *DeGuzman v. United States*, 147 F.Supp.2d 274, 281 (D.N.J. 2001); section 531 (unrelated trade or business income): *Am. Academy of Family Physicians v. United States*, 91 F.3d 1155, 1157–58 (8th Cir. 1996); *see also, e.g., United States v. American Bar Endowment*, 477 U.S. 105, 111, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986); *see generally*, Glen P. Schwartz, "How Many Trades Must a Trader Make to be in the Trading Business?," 22 Va. Tax. Rev. 395, 418–20 (2003) (hereinafter "Schwartz"); Paula Wolff, "What constitutes trade or business under Internal Revenue Code," 161 A.L.R. Fed. 245 (2000). This is not to say that the phrase "trade or business" has precisely the same meaning in every one of the over fifty

no reason why that definition ought not apply here.

Applying the *Groetzinger* test, the court concludes, as a matter of law, that Clearmeadow was not conducting a "trade or business" when, having become a partnership by the addition of CF Advisors as a member, it effectively assumed the short MLD position. Several uncontroverted facts lead to this conclusion. At the time the positions were transferred, Clearmeadow had not conducted any activity with "continuity and regularity," as required by the *Groetzinger* "trade or business" test. Rather, it had been in existence for only ten days. And, at least up to the time of the transfer, the activities in which it had participated were all part of a single, pre-orchestrated transaction planned by outside parties (primarily the Cantley and Sedacca firm) and presented to Hutton for his approval. In analogous settings, courts have concluded that individuals and entities involved in such limited transactions were not conducting a "trade or business" within the meaning of the Code. In *Harris*, 16 F.3d at 81, for example, a partnership was formed to fund the research and development of cement composites, but its sole activity was to obtain patents from a corporation and immediately licensed them back thereto. The Fifth Circuit held that the partnership "did not possess the indicia of continuity and regularity necessary to endow an activity with a trade or business status" for purposes of section 174 of the Code. Rather, it found the partnership to be a passive investment vehicle, reasoning that the prearranged transfer and license back of the patents "was in essence a *single* prearranged deal," adding that "[o]ne prearranged deal does not evidence the continuity and regularity found in trades or business." *Id.* As in *Harris*, the only significant transaction in which Clearmeadow participated prior to the transfer of the MLD short position was also prearranged by third parties, providing strong indication that it was not involved in a trade or business. *See also Mach–Tech, Ltd. v. Comm'r of Internal Revenue*, 67 T.C.M. (CCH) 2984, 2986 (1994), *aff'd*, 59 F.3d 1241, 1995 WL 413099 (5th Cir.1995) (partnership did not conduct a trade or business where, as part of a prearranged deal, it was "a passive investor used as a financing vehicle"); *Green v. Comm'r of Internal Revenue*, 83 T.C. 667, 686–87, 1984 WL 15626 (1984) (partnership did not conduct trade or business where it was formed to acquire four patents and immediately licensed the patents for royalty payments).[21]

▮ Indeed, taking a step back, there is little to distinguish this case from many involving whether a taxpayer who engages in securities activities is engaged in a trade or business. In this factual context, courts have long distinguished between "traders," who are viewed as conducting a trade or business, and "investors," who are not, based upon the nature and extent of the activity in which the taxpayer is involved. Under these decisions, a taxpayer who is directly involved in activity which is frequent, continuous and regular is a trader, while those whose activity is more isolated and passive are investors.[22] In drawing this line, courts generally have refused to attribute to the taxpayer, as indicative of trade or business status, trading activ-

---

sections in which it appears in the Code. *See MedChem (P.R.), Inc. v. Comm'r of Internal Revenue*, 295 F.3d 118, 132 (1st Cir.2002); *Central States, Southeast and Southwest Pension Fund v. Ditello*, 974 F.2d 887, 889–90 (7th Cir.1992).

21. To be sure, Clearmeadow participated in a few minor currency option deals *after* the date of the relevant transfer. But, none of these transactions affect its status as of the date the MLD positions were transferred. Moreover, it should not be overlooked that these other currency transactions still numbered only a handful and were extraordinarily minor—involving not the $2.5 million premiums in the MLD transactions, but rather $2,500 premiums.

22. *See, e.g., Diamond v. Comm'r of Internal Revenue*, 930 F.2d 372, 376 (4th Cir.1991); *Estate of Yaeger v. Comm'r of Internal Revenue*, 889 F.2d 29, 33–34 (2d Cir.1989), *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990); *Moller*, 721 F.2d at 813; *Purvis v. Comm'r of Internal Revenue*, 530 F.2d 1332, 1334 (9th Cir. 1976); *Mayer v. United States*, 32 Fed.Cl. 149, 156 (1994); *Holsinger v. Comm'r of Internal Revenue*, 96 T.C.M. (CCH) 85, 86 (2008); *Laureys v. Comm'r of Internal Revenue*, 92 T.C. 101, 136–37, 1989 WL 4225 (1989); *Polakis v. Comm'r of Internal Revenue*, 91 T.C. 660, 670–72, 1988 WL 96220 (1988); *Liang v. Comm'r of Internal Revenue*, 23 T.C. 1040, 1043, 1955 WL 722 (1955); *see also* Schwartz, *supra* at 421–22.

ity performed by third parties or other forms of non-active, indirect involvement. *See DiPortanova v. United States,* 231 Ct.Cl. 623, 690 F.2d 169, 173–74 (1982) (taxpayer not a trader when "by agreement he gave another full control and discretion over operations"); *Levin v. United States,* 220 Ct.Cl. 197, 597 F.2d 760, 765 (1979) (non-active, indirect involvement is insufficient); *Mayer v. United States,* 32 Fed.Cl. at 156 ("the taxpayer must himself perform the activity characterizing the 'trade or business' "); *see also Higgins v. Comm'r of Internal Revenue,* 312 U.S. 212, 218, 61 S.Ct. 475, 85 L.Ed. 783 (1941). Viewed through the lens of these cases, it is readily apparent that Clearmeadow's limited activities put it, at best, in the investor category. As such, it was not conducting a "trade or business" at the time its holdings, including the MLD positions, were subsumed into the newly created partnership. Accordingly, plaintiffs may not invoke section 358(h)(2)(A) to shield their transactions from Treas. Reg. § 1.752–6.

Based on the foregoing, the court finds that Treas. Reg. § 1.752–6 applies with full force here, having the effect of eliminating the increased basis claimed by the partnership in the Canadian currency.[23] Defendant, in fact, offers a second plausible reason why Clearmeadow was not conducting a trade or business at the time its assets were transferred, *to wit,* that key aspects of the transactions in question lacked economic substance. In the court's view, however, this question is best considered in the broader context of determining whether the overall transaction here lacked economic substance, a topic to which the court now turns.

### C.

■■■■ The economic substance doctrine prevents taxpayers from reaping tax benefits from transactions lacking in economic reality. *See Klamath,* 568 F.3d 537, 543–44; *Coltec Indus., Inc. v. United States,* 454 F.3d 1340, 1353–54 (Fed.Cir.2006), *cert. denied,* 549 U.S. 1206, 127 S.Ct. 1261, 167 L.Ed.2d 76 (2007).

Because even the most "patriotic" citizens have no "duty to increase [their] taxes," *Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J.), *aff'd,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), it "is entirely legal and legitimate" to minimize taxes through permissible means. *Estate of Kluener v. Comm'r of Internal Revenue,* 154 F.3d 630, 634 (6th Cir.1998); *see also Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Richardson v. Comm'r of Internal Revenue,* 509 F.3d 736, 741 (6th Cir.2007). However, "transactions which do not vary control or change the flow of economic benefits are to be dismissed from consideration." *Higgins v. Smith,* 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406 (1940); *see also Rothschild v. United States,* 186 Ct.Cl. 709, 407 F.2d 404, 410–11 (1969). Expanding on this thought, the Supreme Court pronounced that—

> [w]here ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

*Frank Lyon Co. v. United States,* 435 U.S. 561, 583–84, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). This represents the sum of the economic substance doctrine which, since "its inception, ... has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit." *Coltec,* 454 F.3d at 1353–54.

■■■■ Plaintiffs argue that this doctrine is inapplicable here because they complied with the letter of the relevant statutes, in particular, the basis rules in section 752. They assert that "all the i's were dotted and the t's were crossed." But, if the economic

---

**23.** At oral argument, defendant ultimately admitted that determining whether, and to what extent, the regulation applies requires the resolution of material factual questions, specifically, questions involving the value of liability assumed

by Clearmeadow as of the date of the exchange. In the order that follows this opinion, the court will establish a procedure for resolving these questions.

substance doctrine means anything, it is that matters of taxation ought not hinge on the proper placement of jots or tittles—as Judge Wisdom once wrote, the doctrine is "no schoolboy's rule," but rather "the cornerstone of sound taxation." *Weinert's Estate v. Comm'r of Internal Revenue*, 294 F.2d 750, 755 (5th Cir.1961); *see also Principal Life Ins. Co. v. United States*, 70 Fed.Cl. 144, 144 (2006). Indeed, the doctrine would serve little purpose were it to apply only after a transaction has already run afoul of other requirements of the Code. To be sure, the trial decision in *Coltec* took a contrary view— one hospitable to the position taken by plaintiffs here—opining that "where the language of the code is clear," the "doctrine is irrelevant." *Coltec Indus., Inc. v. United States*, 62 Fed.Cl. 716, 754 (2004). But, that opinion was reversed. And, in doing so, the Federal Circuit instead held that the economic substance doctrine is "a judicial tool for effectuating the underlying congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance." *Coltec*, 454 F.3d at 1354. Other decisions are to similar effect.[24] Accordingly, plaintiffs cannot sidestep the economic substance doctrine by arguing that they complied literally with the Code.

■ So what do plaintiffs need to show in order to demonstrate that their transactions had economic substance? In *Coltec*, the Federal Circuit found that "a number of different factors [are] pertinent to the determination of whether a transaction lacks economic substance." *Coltec*, 454 F.3d at 1355. Among these, a transaction must be disregarded if it is serves no " 'business or corporate purpose' and performed no 'function' other than to reduce taxes." *Id.* at 1355 (quoting *Gregory*, 293 U.S. at 469, 55 S.Ct. 266). The court also noted that the cases "have repeatedly looked

to the objective economic reality of the transaction," focusing on such indicia as whether a reasonable possibility of profit from the transaction existed or, more basically, whether the transaction affected the taxpayer's financial position in any way. *Id.* at 1356 (citing, *inter alia, Black and Decker Corp. v. United States*, 436 F.3d at 431, 441–42 (4th Cir.2006) and *In re CM Holdings, Inc.*, 301 F.3d at 103). The court harkened back to *Rothschild*, in which the Court of Claims described the roots of the economic substance analysis in terms of whether the transaction has "realistic financial benefit," denying a deduction where there is "neither a possibility nor opportunity of profit to the taxpayer separate and apart from the tax deduction." *Coltec*, 454 F.3d at 1356 n. 16 (quoting *Rothschild*, 407 F.2d at 411–12). In this regard, the court noted that the decisional law "recognize[s] that there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate)." *Coltec*, 454 F.3d at 1357.

■ It appears, however, that these are distinctions without a difference in this case. In their briefs, plaintiffs claim that genuine issues of material fact exist as to whether they followed the "black letter of the law as it was written during the time the transaction was entered," seeming to assert that the existence of those questions precludes the court from granting defendant's motion for summary judgment. But, of course, these fact questions are immaterial because, as noted, plaintiffs' literal compliance with the Code avails them naught. Yet, strangely, at other points in their briefs, plaintiffs readily appear to concede that the MLD investment lacked economic substance. In their response brief, they state (at 13) that "[w]ith

---

24. *See Richardson*, 509 F.3d at 741 (describing the ruling in *Coltec* ); *In re CM Holdings, Inc.*, 301 F.3d 96, 102 (3d Cir.2002) (the economic substance doctrine is "the Government's trump card; even if a transaction complies precisely with all the requirements for obtaining a deduction, if it lacks economic substance it 'simply is not recognized for federal income tax purposes, for better or for worse.' ") (quoting *ACM Partnership v. Comm'r of Internal Revenue*, 157 F.3d 231, 261 (3d Cir.1998)); *Jacobson v. Comm'r of Internal Revenue*, 915 F.2d 832, 837 (2d Cir. 1990); *United States v. Renfrow*, 612 F.Supp.2d 677, 689 (E.D.N.C.2009); *Stobie*, 82 Fed.Cl. at 667 ("Defendant ... correctly points out that literal compliance alone with the Code is not sufficient to validate the tax reporting position taken by plaintiffs."); *Jade Trading*, 80 Fed.Cl. at 45 (same); *H.J. Heinz Co. and Subs. v. United States*, 76 Fed.Cl. 570, 592 (2007).

respect to the third issue in the defendant's motion for summary judgment, as discussed below, the plaintiff at this time will concede, as stated in the FPAA, that the MLD investment lacked economic substance and business purpose." At a later point in the same brief (at 34), they state:

> Although the transaction, the MLD investment, followed the black letter of the law as it was written during the time the transaction was entered and at the time the 2001 tax return was prepared and filed with the Internal Revenue Service, the plaintiff will concede for its cross-motion that the underlying transaction lacked economic substance as stated within the FPAA as issued by the Internal Revenue Service.

And, apparently for good measure, plaintiffs reiterate the same sentiments twice more in the brief in support of their cross-motion (at 9, 14). Finally, at oral argument, plaintiffs' counsel indicated: "For purposes of [the] summary judgment motion and cross-motion summary judgment, plaintiff is at this point willing to acknowledge that, in 2008, the legal climate has changed and now the transaction which was perceived differently in 2001 is a transaction, because there is substantial case law that the transaction lacked economic substance, that it is a transaction that lacked economic substance." Oral Argument of October 29, 2008, Argument of Mr. Shine Lin at 2:46:13–2:46:50.[25]

That plaintiffs, in Janus-like fashion, appear simultaneously to contest and concede defendant's economic substance claims obviously raises concerns as to how far their concessions reach. Those concerns have both procedural and substantive dimensions. Procedurally speaking, a party may concede a fact for purposes of its own summary judgment motion and yet reserve the right to litigate that fact should its motion be overruled. See *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir.1948); 10A Wright, Miller & Kane, *supra*, at § 2720 n. 8 (citing numerous cases). The same is true even if the concessions arise in cross-motions, so long as each party is conceding facts for purposes of

its own motion. See *Massey v. Del Laboratories, Inc.*, 118 F.3d 1568, 1573 (Fed.Cir. 1997); *Wiley v. American Greetings Corp.*, 762 F.2d 139, 140–41 (1st Cir.1985); *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3rd Cir.1968). But, there is no second bite at the apple when a party concedes a fact for purposes of an opponent's motion for summary judgment and the motion is granted. In that instance, the concession, and the ruling upon which it is based, are binding for all purposes. See, e.g., *United States v. Dooley*, 424 F.2d 1067, 1067–68 (5th Cir.1970) (district court could base summary judgment on non-moving party's concession that facts were not in dispute); Wright, Miller & Kane, at § 2720 ("if a party concedes that the facts are not disputed and makes no attempt to file counter-affidavits in response to the opponent's cross-motion under Rule 56, summary judgment, if otherwise proper, may be entered against him"). By logical extension, this result ought to obtain even if the factual concession is made in response to a motion that is only partially granted, provided the concession is integral to the court's ruling.

In the case *sub judice*, plaintiffs have conceded that the transaction in question lacked economic substance not only for purposes of their cross-motion, but also for defendant's motion. To be sure, they are unwilling to admit when Mr. Hutton first realized this and, indeed, deny that he knew, back in 2001, that the transactions in which he was participating lacked economic substance. Nevertheless, in substantive terms, the court cannot read plaintiffs' concessions as anything other than a complete and utter admission that the transactions in question lacked economic substance and thus could not give rise to the greatly inflated inside basis that Clearmeadow attributed to its assets. See *Petaluma FX Partners*, 2008 WL 4682543, at * 16 (construing similar concessions "to mean that petitioner did not intend to challenge on factual grounds the FPAA's determination that [the partnership] was a sham or otherwise lacked economic substance"). And that concession is irretrievable as the court now rules based upon it.

---

**25.** The oral argument was recorded by the court's Electronic Digital Recording (EDR) system. The time stamp refers to the EDR record of the argument.

■ Even if this were not the case, defendant would be entitled to summary judgment on its economic substance claim under RCFC 56(e)(2). That rule provides, in pertinent part, that—

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Highlighting the operation of the similarly-worded Federal Rule of Civil Procedure, the Supreme Court recently found that when a plaintiff neither opposed the factual claims made in a defendant's motion for summary judgment nor specifically challenged the defendant's statement of undisputed facts, but instead filed a cross-motion for summary judgment claiming that the undisputed facts entitled him to summary judgment, summary judgment in the defendant's favor was appropriate. *Beard v. Banks*, 548 U.S. 521, 527–28, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006). Citing the rule, the Court reasoned that "by failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [the plaintiff] is deemed to have admitted the validity of the facts contained in the Secretary's statement." *Id.; see also id.* at 529, 126 S.Ct. 2572 ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Linear Technology Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1325–26 (Fed.Cir.2004); *Grand Acadian, Inc. v. United States*, 87 Fed.Cl. 193, 196–97 (2009).

■ Such is also the case here. Plaintiffs admitted many of the defendant's statements of undisputed facts and failed to challenge, with any specificity, most of those findings which they denied. Nor did their response contain affidavits and other evidence to rebut the documentary evidence that defendant supplied in support of its findings. Such conclusory denials are insufficient to create material questions of fact under RCFC 56. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985); *Grand Acadian*, 87 Fed.Cl. at 196–97. Accordingly, the court concludes that, not only by their admissions, but by their general nonfeasance, plaintiffs have conceded that key aspects of the transactions in question lack economic substance—a finding that not only independently supports a severe reduction of the outside basis claimed by the partnership, but also buttresses the conclusion that Clearmeadow was not in a "trade or business" within the meaning of section 358(h)(2)(A) of the Code, thereby leaving the transaction in question subject to Treas. Reg. § 1.752–6.

## D.

The final question before the court is whether the FPAA correctly asserted that the partners of Clearmeadow are liable for the 40 percent penalty imposed by section 6662 of the Code, attributable to a gross valuation misstatement.

Section 6662 of the Code imposes a variety of accuracy-related penalties for tax underpayments attributable to a variety of conduct, including negligence and other actions giving rise to substantial understatements of tax.[26] Section 6662(a) and (b)(3) of this provision allow the Service to impose a 20 percent penalty on any understatement of tax liability that is attributable to "[a]ny substantial valuation misstatement." 26 U.S.C. §§ 6662(a), 6662(b)(3); *see also Keller v. Comm'r of Internal Revenue*, 556 F.3d 1056, 1059 (9th Cir.2009); Mertens Law of Fed.

---

26. The penalties authorized by this section cannot be "stacked." Treas. Reg. § 1.6662–2(c). For example, even if an underpayment is attributable to both negligence and a substantial understatement of income tax, only a single penalty may be imposed. *Id.* In this case, the IRS imposed multiple penalties, albeit in the alternative. The parties agree that, for purposes of this motion, the court need consider only the penalty associated with a gross valuation misstatement.

Income Tax § 55:22.[27] During the year in question, a "substantial valuation misstatement" arose, *inter alia,* if "the adjusted basis of any property ... claimed on any return of tax ... [was] 200 percent or more of the amount determined to be the correct ... adjusted basis." 26 U.S.C. § 6662(e). Under section 6662(h)(1), the penalty is increased to 40 percent of the understatement to the extent that a portion of the tax underpayment is attributable to one or more "gross valuation misstatements." As in effect during the year in question, section 6621(h)(2) provided that a "gross valuation misstatement" arose if, *inter alia,* the basis of any property claimed on an income tax return was 400 percent or more of the amount determined to be the correct amount of such adjusted basis.[28] In the case of an adjusted basis whose correct value is zero, long-standing Treasury Regulations provide that any higher basis claimed on a return is considered to be a gross valuation misstatement, triggering the 40 percent penalty. Treas. Reg. § 1.6662–5(g). Even when these requirements are met, the penalty applies only if the amount of the underpayment attributable to a valuation overstatement exceeds a threshold of $5,000 (or $10,000 in the case of most corporations). 26 U.S.C. § 6662(e)(2).

 While the amount of the penalty under section 6662(b)(3) must be resolved at the partner level, the determination whether there was a "gross valuation misstatement" should be made in this partnership-level proceeding. Defendant asserts that the penalty applies because the determinations made in

the FPAA regarding Clearmeadow's partnership items cause the bases of its partners' interests in the partnership to be reduced to zero instead of the $2,501,000 claimed. It notes that while the underpayment of tax the partners were required to show on their returns were due to the overstatement of each partner's share of the Canadian currency, under section 732(b) of the Code, the partners determined their adjusted bases in the currency by reference to their outside bases in Clearmeadow before its liquidation. This is significant for, under the Treasury Regulations discussed above, "[i]f a property has a basis of zero, any basis claimed above will be a gross valuation overstatement and the 40 percent penalty will apply." *Petaluma,* 2008 WL 4682543, at * 13; *see also Zfass v. Comm'r of Internal Revenue,* 118 F.3d 184, 191 (4th Cir.1997); *Zirker v. Comm'r of Internal Revenue,* 87 T.C. 970, 978–79, 1986 WL 22047 (1986).

For their part, plaintiffs challenge the overvaluation penalty on several grounds. They contend that section 6662(b)(3) is inapplicable because there was no "valuation overstatement" here, let alone a "gross valuation overstatement," within the meaning of that provision. They asseverate that the Service, in the FPAA, did not contend that Clearmeadow overstated its inside basis, but more broadly claimed that the transactions at issue lacked economic substance. This, plaintiffs assert, is tantamount to having the Service find that there was no inside basis at all. Put in terms of the statutory language, they assert that any tax underpayment here was "attributable to" the transaction's lack of economic substance, not a valuation misstate-

27. Congress enacted the predecessor of this provision (former section 6659 of the Code) in 1981 to discourage taxpayer from significantly overvaluing certain types of properties. *See* H. Rep. No. 97–201, at 243 (1981), U.S.Code Cong. & Admin.News 1981, p. 105. In 1984, Congress enacted section 6621(d) of the Code to provide for enhanced interest on overstatements, doing so "to put more teeth into section 6659." *Neely v. Comm'r of Internal Revenue,* 85 T.C. 934, 957, 1985 WL 15422 (1985). The legislative history of section 6621(d) indicates Congress' intent to stifle tax shelter promotions that exploited overvaluations. *See* H. Rep. No. 98–861 (Conf.Rep.) at 984–85 (1984), U.S.Code Cong. & Admin.News 1984, p. 697. Section 6659 was repealed by the Omnibus Budget Reconciliation Act of 1989,

Pub.L. No. 101–239, § 7721(c)(2), 103 Stat. 2106, 2395–2400, and replaced by section 6662 for returns due after 1989. The legislative history indicates that the purpose of the new penalty was "generally the same as the valuation overstatement penalty provided under present law" with modifications designed to increase the thresholds for triggering the penalty to avoid penalizing "good-faith valuation disputes." H. Rep. No. 101–247, at 1390–91.

28. Subsection (h)(2)(A) accomplishes this result by modifying the formula for calculating a valuation misstatement in subsection (e). Mertens, *supra,* at § 55:22 (explaining how this modification applies).

ment. While the latter argument undoubtedly sheds light on why plaintiffs were so willing to concede the economic substance point, their arguments on this point, despite their tactical concession, are unavailing.

That is not to say that those arguments lack case support. Indeed, there are widely divergent views among the circuits on whether the overstatement penalty applies when a transaction is successfully challenged as lacking economic substance. One on side of this divide are the Fifth and Ninth Circuits. In *Todd v. Commissioner*, 862 F.2d 540 (5th Cir.1988), the parties agreed that certain depreciation deductions were improper because the property in question (refrigerated shipping containers) were not placed in service during the relevant tax year.[29] The Commissioner, nonetheless, sought to impose a penalty under section 6659 (the predecessor to section 6662) because the taxpayer had overvalued the containers. But, the Fifth Circuit demurred, concluding that because the taxpayer was not entitled to any deduction, regardless of the stated value of the containers, any underpayment was not "attributable to" a valuation overstatement. *Id.* Although finding no support for this view in either the language or legislative history of section 6659, the court viewed as instructive on this point the *General Explanation of the Economic Recovery Tax Act of 1981,* prepared by the staff of the Joint Committee on Taxation. *See* Staff of the Joint Committee on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 333 (J. Comm. Print 1981) (hereinafter "General Explanation" or "Blue Book"). It claimed that the *General Explanation* provided a formula for determining whether an underpayment was "attributable to" an overvaluation, under which adjustments to tax liability that do not reduce a taxpayer's basis in property were to be given effect before the determination was made whether an underpayment was attributable to an overvaluation. *Id.* at 542–43.

Later, in *Heasley v. Comm'r of Internal Revenue,* 902 F.2d 380, 383 (5th Cir.1990), the Fifth Circuit, in reversing the Tax Court,

considerably broadened its ruling in *Todd,* holding that an understatement is not attributable to an overvaluation where a transaction is disregarded in its entirety under the economic substance doctrine. The court reasoned:

> Whenever the "I.R.S." totally disallows a deduction or credit, the IRS may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.

*Id.* More recently, in *Weiner v. United States,* 389 F.3d 152, 162–63 (5th Cir.2004), the Fifth Circuit reaffirmed its ruling in *Todd* in holding that, because the taxpayer had conceded the disallowance of a deduction on another ground, the Service could not impose interest under section 6621(c) of the Code as "attributable to" a tax motivated transaction. *See also Alpha,* 84 Fed.Cl. at 628 (following *Todd* in disallowing a section 6662 valuation misstatement penalty).

Around the time that the Fifth Circuit decided *Heasley,* the Ninth Circuit, in *Gainer v. Comm'r of Internal Revenue,* 893 F.2d 225 (9th Cir.1990), considered a case involving another participant in the same tax shelter examined in *Todd.* Adopting much of the reasoning employed in *Todd,* including the "formula" derived from the Blue Book, the court found that because the parties had stipulated that no depreciation deduction was appropriate, there was no tax underpayment "attributable to" the overvaluation of the containers. In this regard, the court stated:

> If we follow this formula and make an adjustment here, Gainer's overvaluation becomes irrelevant to the determination of any tax due. The parties stipulated that the container had not been placed in service in 1981 and the Tax Court therefore found *no* deductions or credits could have been taken in that year. Even if Gainer has correctly valued the container, the underpayment of tax would be the same because the container was not placed in ser-

---

**29.** The timing of depreciation deductions is governed, *inter alia,* by Treas. Reg. § 1.167(a)–10(b), which states that "[t]he period for depreci-

ation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service."

vice. Thus, Gainer's actual tax liability, after adjusting for failure to place the container in service, was no different from his liability after adjusting for any overvaluation.

*Id.* at 228. More recently, in *Keller,* 556 F.3d at 1061, the Ninth Circuit described *Gainer* as holding that "[w]hen a depreciation deduction is disallowed in total, any overvaluation is subsumed in that disallowance, and an associated tax underpayment is 'attributable to' the invalid deduction, not the overvaluation of the asset." "*Gainer* and the formula it embraces from the *General Explanation* require the validity of deductions be determined first," the court held, "and that an overvaluation penalty may only be imposed on any lingering inflated value." *Id.* at 1062; *see also id.* at 1061 ("*Gainer's* holding is such that when a deduction is disallowed in total, an associated penalty for overvaluing an asset is precluded."). Applying *Gainer,* the court concluded that because loss deductions claimed by a taxpayer with respect to a cattle tax shelter had been disallowed on grounds unrelated to the overvaluation of the cattle's basis, the gross valuation misstatement penalty did not apply. *Id.* at 1061–62.

On the other side of the divide are no fewer than five circuits—the Second, Third, Fourth, Sixth and Eighth—as well as the U.S. Tax Court.[30] These courts have expressly disagreed with the Fifth and Ninth Circuits, at least to the extent that the latter courts have suggested that the penalty is inapplicable where a transaction is found to lack economic substance. These cases hold, instead, that "when an underpayment stems from deductions that are disallowed due to lack of economic substance, the deficiency is attributable to an overstatement of value and is subject to [the] penalty under [section 6662(b)(3)]." *Zfass,* 118 F.3d at 190.[31] They reject, as false, any attempt to distinguish between the multiple grounds upon which a deduction based upon an overvalued interest may be disallowed, particularly where the overvaluation is intertwined with a tax avoidance scheme that lacks economic substance. Thus, in rejecting the taxpayer's claim that his underpayment was the result of a partnership being an economic sham rather than from a valuation overstatement, the Sixth Circuit, in *Illes,* stated:

> This is a false distinction. The tax benefit generated by the … shelter was directly dependent upon the valuation overstate-

---

**30.** Under *Golsen v. Comm'r of Internal Revenue,* 54 T.C. 742, 757, 1970 WL 2191 (1970), *aff'd,* 445 F.2d 985 (10th Cir.1971), the Tax Court will follow the decision of the court of appeals to which a case is appealable if the latter court has already decided the issue. Under this rule, in cases appealable to the Fifth and Ninth Circuits, the Tax Court has been compelled to apply the precedents of those circuits. *See, e.g., McCrary v. Comm'r of Internal Revenue,* 92 T.C. 827, 862, 1989 WL 35568 (1989) (following Fifth Circuit precedent); *Derby v. Comm'r of Internal Revenue,* 95 T.C.M. (CCH) 1177, 1194, 2008 WL 540271 (2008) (following Ninth Circuit precedent). However, in *Petaluma FX Partners,* 2008 WL 4682543, at * 14, where it was unrestrained by *Golsen,* the Tax Court joined the Second, Third, Fourth, Sixth and Eighth Circuits in concluding that the gross valuation misstatement penalty could be applied where a deduction is disallowed on economic substance grounds. *Id.* (indicating that "it will give effect to our own views in cases appealable to courts that have not yet decided the issue"). This opinion, indeed, is not surprising for each of the five circuits listed, in fact, generated their decisions while affirming Tax Court decisions, while the Fifth and Ninth Circuit decisions arose in cases in which those courts reversed the Tax Court. The impact of the *Golsen* rule apparently has been overlooked in several cases involving the section 6222 penalties. *See, e.g., Alpha,* 84 Fed.Cl. at 627 (erroneously citing *McCrary* and *Derby* as evidence that the Tax Court supports the restrictive view of the section 6662(b)(3) penalty).

**31.** *See also Merino v. Comm'r of Internal Revenue,* 196 F.3d 147, 155 (3d Cir.1999) ("whenever a taxpayer knowingly invests in a tax avoidance entity which the taxpayer should know has no economic substance, the valuation overstatement penalty is applied as a matter of course"); *Illes v. Comm'r of Internal Revenue,* 982 F.2d 163, 167 (6th Cir.1992) (holding that the tax benefit generated was directly dependent upon the valuation overstatement); *Massengill v. Comm'r of Internal Revenue,* 876 F.2d 616, 619–20 (8th Cir.1989) ("When an underpayment stems from disallowed depreciation deductions or investment credit due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject to the penalty under section 6659."); *Gilman v. Comm'r of Internal Revenue,* 933 F.2d 143, 152 (2d Cir.1991) (recognizing that a transaction that lacks economic substance "generally reflects an arrangement in which the basis of the property was misvalued in the context of the transaction").

ment, and the amount of the tax benefit was actually determined by the amount of the overvaluation. The entire artifice of the ... shelter was constructed on the foundation of the overvaluation of its assets. Plainly, then, Illes's underpayment was attributable to his valuation overstatement.

*Illes*, 982 F.2d at 167; *see also Merino*, 196 F.3d at 158 (rejecting *Heasley* at least where "the overvaluation of the property in question here is an essential component of the tax avoidance scheme"). These courts recognize that it makes little sense to absolve a taxpayer from paying the penalty simply because there is more than one reason why a deduction based upon an overstated basis is inappropriate.[32] Indeed, it is particularly dubious that Congress intended to confer this largesse upon participants in tax shelters, whose intricate plans for tax avoidance often run afoul of the economic substance doctrine. *See McCrary*, 92 T.C. at 862 (Gerber, J. dissenting) (rejecting the Fifth Circuit's analysis, observing that it "creates an unwarranted hierarchy where valuation overstatements are subordinated to every other ground for redetermining a deficiency. If anything, considering the crux of the abusive shelter problem, we should give priority to grounds that support a valuation overstatement.").

In concluding to the contrary, the Fifth and Ninth Circuits unduly relied upon the Blue Book, which in no way should be viewed as a proxy for legislative history. Blue Books are "not signed by any member of Congress and [are] never approved (even by reference) by the full membership of either body." Michael Livingston, "What's Blue and White and Not Quite as Good as a Committee Report: General Explanations and the Role of the 'Subsequent' Tax Legislative History," 11 Am. J. Tax Pol'y 91,101 (1994). Reflecting on this, the Federal Circuit has said that "[a]s a post-enactment explanation, the Blue Book interpretation is entitled to little weight." *Fed. Nat'l Mortgage Ass'n v. United States*, 379 F.3d 1303, 1309 (Fed.Cir.2004); *see also McDonald v. Comm'r of Internal Revenue*, 764 F.2d 322, 336 n. 25 (5th Cir.1985) (noting that Blue Books do "not directly represent the views of the legislators or an explanation available to them when acting on the bill"). Whatever value may be attached to such explanations "stems from the extent to which it accurately provides a compass to more definitive sources of legislative history, such as committee reports." *Grapevine Imports*, 71 Fed.Cl. at 335 n. 15.[33] Indeed, in other cases, both the Fifth and Ninth Circuits have refused to rely upon the Blue Book, absent other consistent legislative history.[31] Yet, here, those courts somehow managed to take

**32.** In this regard, the Second Circuit in *Gilman* observed:

> Had the Commissioner been confined to his fallback position that the taxpayer's basis for depreciation was fair market value, a value far below his claimed purchase price, it would have been entirely sound to say that the asset had been "overvalued" and to impose the section 6659 penalty. If the Commissioner is more successful and persuades the Court to disregard not only the nonrecourse notes but the entirety of the purchase price, thereby lowering the "price" down not only to fair market value but all the way to zero, should the Commissioner's success have the perverse effect of sparing the taxpayer the overvaluation penalty?

*Gilman*, 933 F.2d at 150. To its credit, the Ninth Circuit panel in *Keller* recognized this, stating that "[t]his sensible method of resolving overvaluation cases cuts off at the pass what might seem to be an anomalous result—allowing a party to avoid tax penalties by engaging in behavior one might suppose would implicate more tax penal-

ties, not fewer." 556 F.3d at 1061. But, the panel went on to observe "[n]onetheless, in this circuit, we are constrained by *Gainer*." *Id.*

**33.** *See also Estate of Hutchinson v. Comm'r of Internal Revenue*, 765 F.2d 665, 669–70 (7th Cir. 1985) (Blue Book explanations are entitled to weight when consistent with other evidence of legislative intent); *AD Global v. United States*, 67 Fed.Cl. 657, 678 n. 27 (2005), *aff'd*, 481 F.3d 1351 (Fed.Cir.2007) (citing additional cases cautioning about relying on such summaries absent independent support in legislative history).

**34.** *See Flood v. United States*, 33 F.3d 1174, 1178 (9th Cir.1994) ("the Blue Book is not properly characterized as legislative history because it was written after passage of the legislation and therefore did not inform the decisions of the members of Congress who voted in favor of the Act"); *McDonald*, 764 F.2d at 336 n. 25 (refusing to treat a "passing reference" in a Blue Book "as purporting to describe a formula intended to be applied in determining the meaning of [a Code section]").

a different view in *Todd, Heasley*, and *Gainer*, even though a thorough review of the legislative history of section 6662 and its predecessor provisions reveals absolutely nothing that supports the supposed "formula" found in the Blue Book.

Perhaps more importantly, the Fifth and Ninth Circuit misconstrued what the Joint Committee actually said. Those courts dwelled on the portion of the Explanation that states:

> The portion of a tax underpayment that is attributable to a valuation overstatement will be determined after taking into account any other proper adjustments to tax liability. Thus, the underpayment resulting from a valuation overstatement will be determined by comparing the taxpayer's (1) actual tax liability (i.e., the tax liability that results from a proper valuation and which takes into account any other proper adjustments) with (2) actual tax liability as reduced by taking into account the valuation overstatement. The difference between these two amounts will be the underpayment that is attributable to the valuation overstatement.

*General Explanation,* at 333. But, as has been said elsewhere, this passage "does not contemplate and was not intended to include situations where the deficiency related to a single transaction that could be sustained on multiple grounds." *McCrary,* 92 T.C. at 862 (1989) (Gerber, J. dissenting). Rather, it simply indicates that where several different deductions are disallowed, only those actually attributable to the valuation overstatement should be considered in determining whether the penalty is appropriate. This is clear from an example used by the Joint Committee which is not quoted in any of the relevant opinions. That examples provides, as follows:

> The determination of the portion of a tax underpayment that is attributable to a valuation overstatement may be illustrated by the following example. Assume that in 1982 an individual files a joint return showing taxable income of $40,000 and tax liability of $9,195. Assume, further, that a $30,000 deduction which was claimed by the taxpayer as the result of a valuation

overstatement is adjusted down to $10,000, and that another deduction of $20,000 is disallowed totally for reasons apart from the valuation overstatement. These adjustments result in correct taxable income of $80,000 and correct tax liability of $27,505. Accordingly, the underpayment due to the valuation overstatement is the difference between the tax on $80,000 ($27,505) and the tax on $60,000 ($17,505) (*i.e.,* actual tax liability reduced by taking into account the deductions disallowed because of the valuation overstatement), or $9,800.

*General Explanation,* at 333 n. 2. Accordingly, there is absolutely no indication in the Blue Book that a taxpayer should be spared from the overstatement penalty simply because the overstatement arises from a transaction that lacks economic substance.

To rule otherwise is to invite the sort of gamesmanship that may be lurking in the shadows here—to hold forth the prospect that a taxpayer might engage in an abusive transaction that hinges upon the overstatement of an asset's basis; claim on its tax return the tax advantages associated with that transaction; enjoy the financial benefits of the claimed tax treatment while waiting to see if the transactions is discovered by the IRS; aggressively defend the transaction on audit and even in filing suit; only, in the last instance—perhaps in the face of a motion or on the eve of trial—to concede the resulting deficiency on economic substance grounds and thereby avoid the imposition of the penalty. How convenient. *See McCrary,* 92 T.C. at 865 (Gerber, J. dissenting) (noting that this "solution will encourage taxpayers with no hope of prevailing to petition and concede the underlying deficiency based on a nontax-motivated issue, thus avoiding the additions"). Yet, nothing in the language of section 6662(a), which focuses on whether an underpayment owing to the overstatement is "shown on a return," supports the notion that a taxpayer may avoid the penalty by years later conceding a tax liability that should never have arisen in the first place. *See General Explanation, supra,* at 333 (noting that the focus of the penalty is on the adjusted basis of property "claimed on [a] return").

Creating such a convenient escape hatch would not only defeat the very purpose of the penalty, which is to discourage taxpayers from filing returns that rely upon overstated bases, but, in fact, transmogrify the penalty into one imposed only upon ill-advised litigants. While "[l]ogic and taxation are not always the best of friends," *Sonneborn Bros. v. Cureton*, 262 U.S. 506, 522, 43 S.Ct. 643, 67 L.Ed. 1095 (1923) (McReynolds, J., concurring), this court will not attribute to Congress such illogical results, without the flimsiest of textual support and in the face of a dozen or so well-reasoned opinions from five circuits and the Tax Court holding to the contrary.

In sum, the court finds that there was an underpayment of tax here attributable to a gross valuation overstatement. Accordingly, absent a partner-level defense, the penalty under section 6662(b)(3) for a gross valuation overstatement should apply here.

### III. CONCLUSION

This court need go no further. Based on the foregoing, it **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiffs' cross-motion. As it appears that several minor issues may yet need to be resolved before a final judgment may be entered in this case, on or before July 13, 2009, the parties shall file a joint status report indicating how this case should proceed.

**IT IS SO ORDERED.**